

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-12-00117-CR

JERRY DON WHATLEY, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 294th District Court
Van Zandt County, Texas
Trial Court No. CR05-00442

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Carter

## O P I N I O N

### I.    Introduction

Jerry Don Whatley was convicted by a Van Zandt County jury[1] of aggravated sexual assault of a child by touching.[2]  The jury assessed his punishment at fifty years' imprisonment. The trial court also assessed $573.00 in court costs and $3,249.00 in attorney's fees against him. Whatley contends that his conviction should be reversed because a juror did not reveal material information at voir dire.  He further contends that the evidence is insufficient to support his conviction.  Whatley claims that there is no evidence that he had any intention to commit the accused acts; rather, he alleges the only evidence was that he was asleep at the time and, therefore, did not commit any act intentionally, knowingly, or voluntarily.  Finally, he contends that the evidence is insufficient to support the trial court's assessment of court costs and attorney's fees.

### II.    Voir Dire—Failure to Reveal Material Information

During voir dire, defense counsel asked whether anyone on the panel knew the victim's mother by either her married name, Diane Whatley, or her maiden name, Diane Stringer.  Two panelists acknowledged knowing her.  The next day, after having been selected for and seated on the jury, a third individual, Karen Asher, told the court that she also knew the victim's mother by her maiden name, Diane *Stringer*.  Asher's explanation for not disclosing the information the

---

[1]Originally appealed to the Twelfth Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts.  *See* TEX. GOV'T CODE ANN. § 73.001 (West 2013).  We are unaware of any conflict between precedent of the Twelfth Court of Appeals and that of this Court on any relevant issue. *See* TEX. R. APP. P. 41.3.

[2]The indictment alleged that Whatley "did then and there intentionally or knowingly cause the penetration of the sexual organ . . . by the defendant's finger."

2

previous day when asked by defense counsel was that she misunderstood the name. Asher stated, "I heard *Springer*." Asher then informed the court that she and Stringer were in school together about thirty years ago, that they had played basketball together, and that she had seen Stringer in passing a few times over the last ten years. Asher said that she had last spoken with Stringer "between eight and ten years ago."

Defense counsel was allowed to question Asher. The evidence showed that even though Asher knew Stringer when they were in high school, she did not know the daughter-victim, did not know Whatley, and did not know that Stringer was married to Whatley. Further, Asher had no mutual friends with Stringer. She stated that she had taken Benadryl for a skin condition the day before and then agreed with counsel's suggestion that it might have affected her hearing and her cognitive abilities.

A discussion ensued with questioning by both parties and the trial court concerning any impact that Asher's prior association with the victim's mother, who was to be a witness, would have on her ability to fairly decide the case. Asher characterized her relationship with Diane Stringer Whatley as extremely attenuated and stated categorically that she could fairly consider the testimony. Asher also noted that she had not taken Benadryl on the day of trial; consequently, any problems it might have caused for her during the jury selection process would not be relevant to the day of trial.

Whatley was given the option by the trial court of proceeding with only eleven jurors; he declined, sought to strike Asher, and moved to have the case "reset." The trial court denied Whatley's request to remove Asher from the jury and overruled his motion for a mistrial.

3

The parties cite to *Franklin v. State*, 986 S.W.2d 349 (Tex. App.—Texarkana 1999), *rev'd*, 12 S.W.3d 473 (Tex. Crim. App. 2000), as the controlling law on this issue. In *Franklin*, a juror failed to disclose during voir dire questioning that she knew the victim in the case. When the victim was called to testify, the juror recognized her and immediately informed the trial court of her prior relationship with the victim. In response, the trial court asked the juror if she could base her judgment in the case solely on the evidence presented at trial rather than her prior relationship with the victim. *Id.* at 476. The trial court, however, refused to allow counsel to question the juror. *Id.* at 477.

As pointed out by the Texas Court of Criminal Appeals in *Franklin*, the fact that the misleading information was not intentionally withheld is irrelevant when considering its materiality. Even though the Texas Court of Criminal Appeals recognized that mere familiarity with a witness is not necessarily material, it deemed the trial court's denial of Franklin's request to question the juror error and remanded to this Court for a harm analysis.[3] On remand, we recognized that the trial court's error was of constitutional dimension. *See* TEX. R. APP. P. 44.2(a).

Based on the absence of any evidence in *Franklin* relevant to the harm inquiry—due to the trial court's refusal to allow questioning of the juror by defense counsel—we concluded that the error could not be shown to be harmless beyond a reasonable doubt and reversed the judgment. *Franklin v. State*, 23 S.W.3d 81, 83 (Tex. App.—Texarkana 2000), *aff'd*, 138 S.W.3d

---

[3]The Texas Court of Criminal Appeals reviewed *Franklin* again after this Court issued its opinion on remand and, at that time, re-characterized the error as a failure to grant Franklin a mistrial. *Franklin v. State*, 138 S.W.3d 351, 357 (Tex. Crim. App. 2000).

4

351. As explained by the Texas Court of Criminal Appeals, it is "not necessary that the concealed information show actual bias; just that it has a tendency to show bias, thus implicating his constitutional right to trial by an impartial jury." *Franklin*, 138 S.W.3d at 356.

*Franklin* is distinguishable from this case in several respects. In *Franklin*, the child-victim and the juror's daughter were in the same Girl Scout troop, and the juror was the assistant troop leader for that troop. This type of relationship has been described as "almost a parental role." *Brown v. State*, 183 S.W.3d 728, 740 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd). Defense counsel in *Franklin* requested an opportunity to further develop the nature of the relationship between the victim and the juror but was denied such right by the trial court; in contrast, defense counsel in this case was allowed to fully develop such information. In *Franklin*, the defense counsel stated that had he known of this relationship, he would have exercised a peremptory challenge on the juror.

In the instant case, counsel questioned the juror in some detail. The claimed error is in the failure to grant a new trial because the information elicited had a tendency to show bias. In determining whether the trial court erred in failing to grant a mistrial[4] or a new trial, we must determine if the withheld information was material. If material information is withheld, it is constitutional error to deny a motion for mistrial because it denies the parties the opportunity to exercise their challenges, hampering the selection of a disinterested and impartial jury. *Franklin*, 138 S.W.3d at 353–54. Mere familiarity with a witness is not necessarily material information.

---

[4]Whatley never specifically requested a mistrial but did request that the trial court "reset" the case, and such motion was denied. We will assume for this discussion that the request for a "reset" was equivalent to a motion for a mistrial.

*Franklin*, 12 S.W.3d at 478. The Texas Court of Criminal Appeals has held that in order to be material, the withheld information must be of a type that shows the relationship had a potential for prejudice or bias of the juror. *Decker v. State*, 717 S.W.2d 903, 907 (Tex. Crim. App. 1983) (withheld fact that juror worked with complaining witness not material given lack of evidence of socialization or friendship); *Lopez v. State*, 261 S.W.3d 103 (Tex. App.—San Antonio 2008, pet. ref'd) (withheld facts that witness was friend of juror's girlfriend's stepfather and that juror had seen witness at social gathering deemed immaterial when juror, after equivocating, stated he would be fair; not material because facts failed to show potential for bias or prejudice); *Brown*, 183 S.W.3d at 740 (juror's knowledge of police officer witness through Christian retreat deemed immaterial in absence of evidence of friendship and/or socialization); *Whiting v. State*, 943 S.W.2d 102, 105 (Tex. App.—Houston [1st Dist.] 1997, pet. ref'd ) (fact that witness and juror lived in same apartment unit and had met in parking lot not material).

Here, after questioning by the State and defense attorney, the nature of the relationship of the juror and witness was revealed. Since there was a thirty-year lapse between the juror and mother attending school together and the present date with little interaction during that entire time period, there is no indication of potential prejudice or bias of the juror. Further, the juror did not know either the defendant or the victim and stated that she would be able to make her decision solely on the evidence. We find that the withheld[5] information was not material and that Whatley was not deprived of an impartial jury.

---

[5]The term "withheld" generally connotes that the witness acted purposely. We use that term because the Texas Court of Criminal Appeals has stated that the good faith of the juror is "largely irrelevant when considering the materiality of information withheld." *Franklin*, 12 S.W.3d at 478.

Accordingly, we conclude no error was committed.

## III.    Sufficiency of the Evidence

Whatley contends that the evidence is insufficient to support his conviction. Generally, the question in such a case is whether the defendant has committed the act. Here, that is not an issue—there is direct evidence that Whatley inappropriately touched the child. But this is not the typical case. The question before us here is whether, in light of the unwavering testimony of the victim that Whatley was asleep each time he touched her, there is any evidence that he did so with the requisite *mens rea*, or whether he did so voluntarily. *See* TEX. PENAL CODE ANN. §§ 6.01(a), 6.02 (West 2011).[6]

### A.    The Evidence

The State's evidence included testimony of the victim's mother recounting the outcry of the then eleven-year-old victim—that "dad" touched her, but was asleep—and described a family discussion that occurred immediately thereafter. The State also introduced a "voluntary statement" provided by the victim's mother, which was read to the jury.

Evidence from the victim came in through different means. She was eighteen years old when she testified at trial. The State also introduced a video-recorded interview of the victim conducted by the Smith County Child Advocacy Center (CAC) when she was eleven years old.

---

[6]In reviewing the legal sufficiency of the evidence, we review all the evidence in the light most favorable to the jury's verdict to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd). We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19).

The DVD containing that interview also contained a video recording of an interview conducted with the mother by at least two officers—conducted in a squad car, with the camera focused out the window. It is effectively an audio recording.

The victim testified under the pseudonym Melany Carter. She described Whatley touching her vagina, around and inside. Her testimony indicates that three different instances of sexual assault occurred. The first event occurred when they were in Arkansas on vacation (in the earlier recorded statement, she stated that these events occurred in Austin, not Arkansas). At the time, she, her mother, Whatley and her brother were sharing a bedroom, and she and Whatley were in bed alone, with her mother out of the room. Her mother came in, and they slept together that night. The second time was while still on vacation, and the third time was at their home in Canton.

### 1. Direct Examination of Victim

In order to precisely state evidence presented in this case, we quote substantial portions of the trial testimony. Relevant portions of Melany's direct examination follow:

> Q. And was it common or uncommon for the two of you to sleep in the same bed?
>
> A. Uncommon.
>
> Q. Uncommon. Do you know if [Whatley] was asleep or awake when he touched you?
>
> A. Well, I was -- I had my back facing to him.
>
> Q. Okay. So -- okay. Well, describe for me how you and he were laying in the bed.
>
> A. He was behind me and I had my back facing to him.

8

Q.      Okay.  So his front was to your back?

A.      Uh-huh.

Q.      Okay.  Tell the jury what happened.

A.      He touched my vagina, but he didn't penetrate it.

Q.      Okay.  Were you clothed when this happen?

A.      Yes, sir.

Q.      Do you recall what you were wearing?

A.      Sleep pants and a shirt.

Q.      Okay.  Do you recall what he was wearing?

A.      Just some shorts.

Q.      Okay.  Did he touch you in any other manner or did he just touch you on your vagina?

A.      He just touched me on my vagina.

Q.      Okay.  Did he say anything to you when that occurred?

A.      No, sir.

Q.      Did you say anything to him when that occurred?

A.      No, sir.

Q.      And you said that he touched, but he did not penetrate.  Can you describe the touch?

A.      It was just light, under my clothes.  He like reached under my clothes and just kind of rubbed.

Q.      Okay.  Was it skin-to-skin contact?

9

A.     Yes, sir.

. . . .

Q.     Is that the only incident that occurred in the cabin on the lake in Arkansas?

A.     No, sir.

Q.     Where did the other incident occur?

A.     We were downstairs in the second living area and I -- we were in a recliner chair.  I had come down there, I'm not sure for what reason, but we were watching TV.  And I came to sit down on the recliner chair arm **and he was asleep at the time or falling asleep at the time and we were just watching TV.**  And his eyes were still closed, but his hand started moving and he made me -- he made me touch his penis.

. . . .

Q.     Do you recall what you were wearing?

A.     No, sir.

Q.     Do you recall what he was wearing?

A.     No, sir.

Q.     You said that he made you touch his penis.  Was it on top of his clothes or underneath his clothes?

A.     Both.

Q.     Were his eyes open or closed?

A.     Closed.

Q.     Did he say anything to you?

A.     No, sir.

Q.     Did you say anything to him?

10

A.      No, sir.

Q.      Did you tell your mom?

A.      No, sir.

. . . .

Q.      Can you recall any other times that Jerry Whatley has touched you inappropriately?

A.      Yes, sir.

Q.      When was the next time?

A.      At 1520 Woodland Drive in Canton.

Q.      Do you recall about when that was?

A.      Whenever I was ten or 11.  I'm not sure what date exactly.

Q.      Where did it occur at 1520 Woodland?

A.      In my bedroom.

Q.      Can you describe how it happened?

A.      He -- I was supposed to be doing chores and he would come in and check on me every once in a while.  And so I'm not -- I don't remember how we ended up where we got laying on the bed, **but he had his eyes closed and I guess he was asleep**, but we were just laying there.  And I was facing towards my window across from my door and he was -- he had his front to me and I had my back to him, and he reached around and touched my vagina and he actually penetrated it that time.

Q.      Melany, do you recall if you were clothed or unclothed?

A.      I had clothes on.

Q.      Do you know if he was clothed or unclothed?

11

A.      He had clothes on.

Q.      Okay.  Did he say anything to you when he touched you on your vagina?

A.      No, sir.

Q.      Did you say anything to him?

A.      Yes -- no, sir.

Q.      **You said that his eyes were closed and he appeared to be asleep?**

A.      **Yes, sir.**

Q.      Did you attempt to wake him up?

A.      No, sir.

Q.      Did he penetrate your vagina?

A.      Yes, sir.

Q.      Is that the first time that he had penetrated your vagina?

A.      Yes, sir.

Q.      Is that the only time he penetrated your vagina?

A.      Yes, sir.

Q.      Did you touch him at all during this incident on 1520 Woodland Drive?

A.      No, sir.

Q.      Did you ever talk to [Whatley] about these times when he touched you inappropriately on your vagina?

A.      Yes, sir.

12

Q. Do you recall when you talked to him?

A. No, sir. Well, sometime after it had happened.

Q. You said sometime after it had happened. We've talked about a couple different times here. You've told the jury about two times in Arkansas and one time on Woodland.

A. After the Canton incident.

Q. After the Canton incident. What did you tell him?

A. I told him that he had touched me inappropriately.

Q. Did he say anything to you?

A. Yes. **He told me to tell him next time that he does it and try to wake him up.**

Q. Did you tell him about the times in Arkansas?

A. No, sir.

Q. Did you tell your mom?

A. No, sir.

(Emphasis added.)

### 2. Cross-Examination of Victim

Relevant portions of Melany's testimony on cross-examination follow:

Q. So you talked only to your mother about this?

A. Yes, sir.

Q. Do you remember meeting with a woman referred to as a CAC interviewer in Tyler?

A. Yes, sir.

Q. I'm sorry, I didn't hear you.

A. Yes, sir.

Q. So you remember those events clearly?

A. Yes, sir.

Q. Do you remember telling the CAC interviewer that you referred to him as dad? Jerry -- you referred to Jerry Whatley as "dad"?

A. Yes, sir.

Q. **Do you remember telling, Dad was asleep?**

A. **Yes, sir.**

Q. So do you also remember telling her that, I got in bed with him and I guess he thought I was mom?

A. No, sir.

Q. You don't remember saying that?

A. No, sir.

Q. **Do you remember saying his eyes were closed and he was snoring?**

A. **Yes, sir.**

Q. **Do you remember saying, I don't think he knows what -- he knew what he was doing to me? Do you remember saying that?**

A. **Yes, sir.**

Q. I believe also -- do you remember saying, He stops when I wake him up? Do you remember saying that?

A. No, sir.

14

Q. **You don't remember saying that specifically, but you've consistently said that you believe that Jerry Whatley was asleep during all these incidents, didn't you?**

A. **Yes, sir.**

Q. Is it fair to say that you have some doubts whether he was knowingly and intentionally hurting you?

A. No, sir, I don't have any doubts.

Q. **But you testified that he was asleep, correct?**

A. **Yes, sir.**

Q. All right. So you testified that you would get in bed with him when he was sleeping during these occasions?

A. No, sir, I would not get in bed with him.

Q. **But you did testify that he was sleeping during these times?**

A. **Supposedly asleep.**

Q. **You said you told the CAC interviewer that he was sleeping and he didn't know what he was doing to you. You did tell that to the CAC interviewer?**

A. **Yes, sir, I did.**

. . . .

Q. But you did say that you confronted [Whatley] about these incidents and he told you, Wake me up?

A. The last incident that happened, the one in Canton was the one that I told him about whenever he -- whenever I told him and he said, The next time it happens, wake me up, shake me, do something.

Q. So you only told him about the one incident?

A. Yes, sir.

15

Q.    **And, once again, previously you told people that he was sleeping while this was happening?**

A.    **Yes, sir.**

(Emphasis added.)

### 3.    Re-Direct Examination of Victim

Finally, relevant portions of Melany's testimony on re-direct examination are excerpted below:

Q.    Melany, Mr. Harris was talking about the CAC video wherein you went to Smith County, was interviewed by a forensic interviewer. Do you recall him asking you questions about that?

A.    Yes, sir.

Q.    **And he said something to the effect that you stated, according to him, that, I guess he thought I was mom; is that correct?**

A.    **Yes, sir.**

Q.    **And a lot of other things like he appeared to be asleep, I don't guess he knew it was me or what he was doing. And what he said lastly was, He stops when I wake him up; is that correct?**

A.    **Yes, sir.**

Q.    **About how long would it take, if you remember, for Jerry Whatley to go to sleep before his hands ended up on your vagina or in your vagina?**

A.    **A few minutes.**

Q.    A few minutes?

A.    Yes, sir.

16

> Q. So it's not like you were laying in there hours on hours upon hours?
>
> A. No, sir.
>
> **Q. In just a few minutes, he was asleep enough -- you felt like he was asleep that maybe he thought you were -- you were your mother?**
>
> **A. Yes, sir.**

(Emphasis added.)

### 4. Video-Recorded CAC Interview of Victim

Melany's video-recorded CAC interview, conducted when she was eleven years old, also discusses the three instances of sexual abuse in similar terms. In describing the events, Melany repeatedly testified that Whatley was asleep when they occurred. The following excerpts from that interview begin with Melany's response to an inquiry into what it meant to warn Whatley:

> **A. It means wake him up when he's doing it cause he's halfway asleep -- sometimes you're asleep.**
>
> Q. Did he tell you he was halfway asleep?
>
> **A. No, I just know his eyes were closed and he was snoring.**
>
> **Q. His eyes were closed and he was snoring?**
>
> **A. Yes he was (indicating snoring sound) and like that, and he snores sometimes.**
>
> **Q. . . . did dad ever tell you that he was asleep?**
>
> **A. Huh-uh (negative response). He never knew about that thing.**
>
> **Q. He didn't know about the thing? Didn't know about what thing?**
>
> **A. The things he was doing to me.**

17

> Q.   **Why do you think he didn't know about that?**
>
> A.   **Because he was sound asleep.**

(Emphasis added.)

In discussing with the CAC interviewer the event that took place between Whatley and Melany in a recliner chair, Melany stated,

> A.   . . . he pulled me over there **and he was halfway asleep again**, and --
>
> Q.   **You say halfway asleep, what do you mean when you say halfway asleep?  What's he doing?**
>
> A.   **Uh, he usually has his eyes closed like this and he mumbles** . . .
>
> Q.   So you sat down on the arm of the chair, is that what you're telling me?
>
> A.   . . . to see what he was doing, and we watched TV for a little while, then he fell asleep.
>
> . . . .
>
> A.   He made me touch his private part.

(Emphasis added.)

In discussing the sexual contact in Canton, the victim explained:

> A.   **[H]e lay down because he was tired and he fell asleep** -- and he started touching me again, and I was laying down.
>
> Q.   **Okay, . . . I just want to be sure I have this right.  You're telling me dad is asleep, . . . right?**
>
> A.   **Yes, ma'am.**

18

Q.     **And so, he's touching you.  Are you telling me . . . that dad is asleep when he's touching you, or he's awake?**

A.     **He's asleep when he's touching me.**

Q.     And how do you know he's asleep when he's touching you?

A.     Because he always has his eyes closed.

Q.     **You think dad knows that he's touching you . . . ?**

A.     **No, ma'am.**

Q.     **Why do you think he doesn't know that he's touching you?**

A.     **Cause he's probably halfway asleep and his eyes are closed, and he doesn't know if I'm mom or I'm somebody else.**

. . . .

Q.     **So has he been asleep very long when he starts touching you?**

A.     **No, ma'am.  He just falls asleep, and I kinda nudge on him and he'll stop.**

. . . .

Q.     **[Y]ou told me about several times that step dad [Whatley] has touched you.  Has he ever been awake when he's touching you?**

A.     **No, ma'am, he hasn't.**

(Emphasis added.)

### 5.     Re-Cross Examination of Victim

Melany was then recalled by the State at the close of testimony, after the video-recorded

CAC interview of her at age eleven was played for the jury.  Defense counsel cross-examined

19

her at that time about the content of the recorded interview.  Relevant excerpts of that examination follow:

> Q.	**Now, the video we just got through watching, there were several times you made statements such as, Dad was asleep, correct?**
>
> A.	**Yes, sir.**
>
> Q.	**And you also said on the video, I got in bed with him and I guess he thought I was mom?**
>
> A.	**Yes, sir.**
>
> Q.	**And there was also another point where you said, His eyes were closed and he was snoring, correct?**
>
> A.	**Yes, sir.**
>
> Q.	**You also said on the video, He didn't know about the things he was doing to me?**
>
> A.	**Yes, sir.**
>
> Q.	Now, also there was several times that the woman that you were talking to, the CAC interviewer, she kept asking you over and over again about things that happened in Canton, didn't she?
>
> A.	Yes, sir.
>
> Q.	And you consistently told her that Jerry Whatley was sleeping, right?
>
> A.	Yes, sir.
>
> Q.	**You kept constantly -- she asked you over and over again and over and over again you said he was sleeping, he didn't know what he was doing to me?**
>
> A.	**Yes, sir.**

> **Q. Several times you said, He must have thought I was mom or somebody else?**
>
> **A. I said that once, if I remember correctly.**

(Emphasis added.)

## B. Voluntariness

A defendant commits aggravated sexual assault of a child if he intentionally or knowingly causes the penetration of the sexual organ of a child younger than fourteen years of age by any means. TEX. PENAL CODE ANN. § 22.021(a)(1)(B), (2)(B) (West Supp. 2012). The statute includes a specific *mens rea* requirement—intentionally or knowingly—as an element of the offense that must be proven by the State. TEX. PENAL CODE ANN. § 22.021 (West Supp. 2012). A finding that actions are knowingly or intentionally committed, however, presupposes that the actions taken were voluntary. The requirement of a voluntary act under Section 6.01(a) is not subsumed by the *mens rea* requirement of Sections 22.021(a)(1)(B) and (2)(B). *See Brown v. State*, 955 S.W.2d 276, 280 (Tex. Crim. App. 1997). "[T]he issue of the voluntariness of one's conduct . . . is separate from the issue of one's mental state." *Adanandus v. State*, 866 S.W.2d 210, 230 (Tex. Crim. App. 1993).

The separate concept that before an action is criminal, it must be voluntarily done, is codified at Section 6.01(a) of the Texas Penal Code, which states, "A person commits an offense only if he voluntarily engages in conduct, including an act, an omission, or possession." TEX. PENAL CODE ANN. § 6.01(a). The Texas Court of Criminal Appeals has made it clear that the term "voluntarily," as used in Section 6.01(a), has a very specific and limited meaning.

> "Voluntariness," within the meaning of Section 6.01(a), refers only to one's own physical body movements. If those physical movements are the nonvolitional result of someone else's act, are set in motion by some independent non-human force, are caused by a physical reflex or convulsion, or are the product of unconsciousness, hypnosis or other nonvolitional impetus, that movement is not voluntary.

*Rogers v. State*, 105 S.W.3d 630, 638 (Tex. Crim. App. 2003). Many of the cases discussing voluntariness involve an accidental act. *Alford v. State*, 866 S.W.2d 619, 624 (Tex. Crim. App. 1992) ("Rather, the State need not prove voluntariness unless the evidence raises the issue of accident, in which case the State must disprove the theory of accident beyond a reasonable doubt."). When the issue of voluntariness is raised by the evidence, the State must prove the voluntary nature of the act; absent such proof, the evidence is insufficient to support a conviction.[7] *Id.* We will review the evidence currently before us in light of the foregoing to determine if it is sufficient to support the verdict.

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge "sets out the law, is authorized by the indictment,

---

[7]We note that in the context of charge error, cases liken the issue of voluntariness to a defensive theory. *See, e.g.*, *Bermudez v. State*, 533 S.W.2d 806, 807 (Tex. Crim. App. 1976) (voluntariness under Section 6.01(a) is in nature of defense). The reasoning in *Bermudez* and that line of cases is not apposite here, as the issue in *Bermudez* was whether the absence of a voluntariness *allegation* made the *indictment fundamentally defective*. *See id.* However, while the line of cases following *Bermudez* consistently state that voluntariness need not be separately proven by the State in every prosecution, they also consistently state that in every case where the theory is raised by the evidence, the State has the burden of proving the voluntariness of the acts. As a consequence, a specific jury charge or instruction on voluntariness should be given upon request. *Posey v. State*, 966 S.W.2d 57, 62 (Tex. Crim. App. 1998).

We also recognize that this line of cases does not suggest that the application of the proper, statutorily-imposed burden of proof is dependent upon the provision of a voluntariness instruction. Rather, as parsed by the Texas Court of Criminal Appeals, the requirement exists in every case. However, because the issue is not raised by the evidence in every case—in fact, the evidence raises this issue in very few cases—it need not be included as an allegation in the indictment.

does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id*.

Whatley was convicted of aggravated sexual assault of a child. The elements of the crime are set out in Section 22.021 of the Texas Penal Code. *See* TEX. PENAL CODE ANN. § 22.021. A person commits this offense (1) if the person (2) intentionally or knowingly (3) causes the penetration of the sexual organ of a child under fourteen by any means. TEX. PENAL CODE ANN. § 22.021(a)(1)(B)(i), (b)(1), f(2)

As previously mentioned, the issues in this sufficiency review are whether Whatley's acts were voluntarily and intentionally or knowingly done. However, it is obvious that if the evidence is insufficient to prove Whatley's actions were voluntary, as that term is defined, then it is necessarily insufficient to show that they were either intentionally or knowingly done.

### 1.    The Role of the Jury:  Reasonable Inferences

Because the jury is the sole judge of the weight and credibility of the witnesses' testimony, it may accept or reject any or all testimony of any witness. *See Heiselbetz v. State*, 906 S.W.2d 500, 504 (Tex. Crim. App. 1995). The jury may also consider the evidence presented and make reasonable inferences based on that evidence. As the Court of Criminal Appeals has observed,

> The jury can draw multiple reasonable inferences as long as each inference is supported by evidence presented at trial. . . . [A]n inference is a conclusion reached by considering other facts and deducing a logical consequence from them. Speculation is mere theorizing or guessing about the possible meaning of facts and evidence presented. A conclusion reached by speculation may not be

23

completely unreasonable, but it is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt.

*Hooper*, 214 S.W.3d at 16.

Intent may be inferred from circumstantial evidence and from the defendant's words, acts, and conduct. *Lay v. State*, 359 S.W.3d 291, 295 (Tex. App.—Texarkana 2012, no pet.) (citing *Laster v. State*, 275 S.W.3d 512, 524 (Tex. Crim. App. 2009); *Brown v. State*, 122 S.W.3d 794, 800 (Tex. Crim. App. 2003)).

Whatley contends that the only evidence concerning the voluntary nature of his acts is the testimony of Melany and that her testimony shows that any touching occurred while he was asleep. Consequently, he contends, his acts could not have been voluntary. Although the term "voluntary" is used as an integral part of Whatley's argument before this Court, that argument is in the context of a *mens rea* analysis to determine whether there is evidence that he did the act "intentionally or knowingly."

If the evidence cannot be reasonably understood to show that he was in fact awake and consciously engaging in the alleged actions, he cannot be guilty of the crime. *See* TEX. PENAL CODE ANN. § 6.01, 6.02 (West 2011). Logically, if he was not awake or consciously engaging in the alleged actions, he also could not have taken these actions either knowingly or intentionally. The Texas Court of Criminal Appeals has cited with approval the following language from the Model Penal Code regarding non-volitional acts:

§ 2.01. Requirement of Voluntary Act; Omission as Basis of Liability; Possession as an Act.

24

(1)     A person is not guilty of an offense unless his liability is based on conduct that includes a voluntary act or the omission to perform an act of which he is physically capable.

(2)     The following are not voluntary acts within the meaning of this Section:

(a)     a reflex or convulsion;

(b)     a bodily movement during unconsciousness or sleep;

MODEL PENAL CODE § 2.01 (2001); *Rogers*, 105 S.W.3d at 637 n.14.  We, therefore, recognize that to secure a conviction, the State must prove the culpable mental state and its necessary underpinning—that the criminal act was voluntarily committed.  *See Alford*, 866 S.W.2d at 622.

Is this evidence sufficient to allow a jury to conclude beyond a reasonable doubt that Whatley acted "intentionally or knowingly" in light of the evidence that he was asleep when the acts occurred?  Further, is the evidence sufficient to prove the acts of Whatley were voluntary?  In this instance, voluntariness is clearly raised by Melany's testimony.  In order to convict, the jury would first have to discount and disregard her overall testimony and then be able to properly draw inferences from some source to show that, despite the repeated testimony of the victim, there is evidence that supports a finding that Whatley was actually awake when the acts occurred.  While the jury is certainly free to disbelieve a witnesses' testimony, such disbelief does not provide evidence of the contrary.

The question then becomes what evidence is there that could support an inference that Whatley was not asleep.  We will review the evidence from sources that could possibly supply support for the verdict.

### 2.     The Victim's Testimony

Melany testified at trial as follows:

Q.     You said that his eyes were closed and he appeared to be asleep?

25

A.    Yes, sir.

Q.    Did you attempt to wake him up?

A.    No, sir.

. . . .

Q.    I believe also -- do you remember saying, He stops when I wake him up?  Do you remember saying that?

A.    No, sir

Q.    You don't remember saying that specifically, but you've consistently said that you believe that Jerry Whatley was asleep during all these incidents, didn't you?

A.    Yes, sir.

Q.    Is it fair to say that you have some doubts whether he was knowingly and intentionally hurting you?

A.    No, sir, I don't have any doubts.

Q.    But you testified that he was asleep, correct?

A.    Yes, sir.

Q.    All right.  So you testified that you would get in bed with him when he was sleeping during these occasions?

A.    No, sir, I would not get in bed with him.

Q.    But you did testify that he was sleeping during these times?

A.    Supposedly asleep.

Q.    You said you told the CAC interviewer that he was sleeping and he didn't know what he was doing to you.  You did tell that to the CAC interviewer?

A.    Yes, sir, I did.

26

These excerpts are the only places where Melany uses language that is anything less than a definitive statement that Whatley was asleep. The first portion of the excerpt is nothing more than agreement that Whatley appeared to be asleep. Taking it as testimony that he only appeared to be asleep and, thus, might have been faking, is stretching the testimony beyond its content.

The second portion of the excerpt mentions "testify" (with the implication taken by the State being that this was part of her testimony about his behavior). That is somewhat misleading. The context shows that counsel's questions relate to Melany's statements during her CAC interview. Her testimony was not that he was "[S]upposedly asleep," it was that she recalled telling the interviewer that he was supposedly asleep. Both immediately before and after this courtroom testimony, the victim acknowledged that she had told the interviewer that he was asleep. Melany's actual testimony during her CAC interview was that Whatley was asleep, not that he was supposedly asleep.

It could be argued that Melany stated that she had no doubts that Whatley was intentionally and knowingly hurting her and that this statement provides support for the verdict.[8] Immediately before and immediately after testifying to this conclusion, Melany specifically testified that Whatley was asleep during the relevant times. This testimony must be juxtaposed with all other testimony from the victim, when she was a young girl of eleven and later at age

---

[8]However, upon closer inspection, Melany's statement regarding her doubt, or lack thereof, as to Whatley's mental state is ambiguous, at best. Melany was asked, "Is it fair to say that you have some doubts whether [Whatley] was knowingly and intentionally hurting you?" The term "whether" is used in this question as a conjunction introducing a single alternative where the other alternative is implied or understood. The understood or unspoken alternative is whether Whatley was *not* knowingly and intentionally hurting Melany. This single question, posed by defense counsel with no follow-up from either side, does nothing more than establish that, at the time of trial, Melany had *no doubts* about Whatley's *mens rea* at the time of the incident. Whether she believed that he *was* or *was not* knowingly and intentionally hurting her was neither asked nor answered on this record.

eighteen. In her direct testimony in court, she stated many times that Whatley was asleep when the acts occurred. She did not claim that her statements given on the video recording were made when she was confused, unsure, or too young to realize if Whatley was asleep.

The Texas Court of Criminal Appeals has repeatedly stated that we must not intrude upon the "fact finder's role as the sole judge of the weight and credibility given to witness testimony." *Johnson v. State*, 23 S.W.3d 1, 5 (Tex. Crim. App. 2000). Here, to reach its conclusion, the jury necessarily disregarded Melany's testimony that Whatley was asleep. The testimony of the victim, without more, is insufficient to establish that Whatley voluntarily committed the acts as alleged in the indictment. We will examine whether there is other circumstantial evidence sufficient to support the verdict.

### 3. Whatley's Actions

An individual's mental state is almost always inferred from acts and words. The mental culpability of a defendant is of such a nature that it generally must be inferred from the circumstances in which a prohibited act or omission occurs. A mental state is typically concealed within the mind of an individual and is, thus, properly determinable from his words, acts, and conduct. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004); *Moore v. State,* 969 S.W.2d 4, 10 (Tex. Crim. App. 1998). These cases presuppose, however, that the acts and words are by a conscious person committing volitional acts.

The acts and conduct of Whatley have been described in detail. But in each instance, Melany indicated that when the acts were committed, Whatley was asleep. Are Whatley's statements sufficient to allow an inference of guilt? In this case, the only words attributed to

28

Whatley indicate his shock and surprise, along with directives to the victim to shake him and to wake him up if he ever did anything like that again. On a broader scale, no evidence was proffered of other crimes, wrongs, or acts that might be relevant on the issue of intent. *See* TEX. R. EVID. 404(b). Next we will consider whether the victim's mother's testimony is sufficient evidence to support the verdict.

### 4. Mother's Testimony

The State focuses on the jury's ability to disbelieve some evidence as proof of the contrary and suggests that one other piece of testimony supports the jury's verdict in this case. The State points out that when the mother was asked if Whatley had ever done any such thing during the course of their marriage to her, her response was that on one occasion, he had rolled over and grabbed her breast.

The appellate record also contains her video-recorded interview taken by police officers at the time the investigation took place.[9] What she told those officers is radically different from her testimony at trial, as the following excerpts will illustrate.

> Q. [By Officer 1] Hope I'm not out of line by asking it --
>
> A. Ask it.
>
> Q. In all the years that you were married, has he ever done the same action with you that he has done with her?

---

[9]This statement is included in State's Exhibit 5, a DVD that contains the video-recorded CAC interview of Melany at age eleven. The entire exhibit was offered into evidence by the State, and the trial court allowed its introduction. At some later time during the trial, the State referred to this statement of the victim's mother and stated that it had not been introduced into evidence, but, in fact, it had. The exhibit was offered and received into evidence without qualification even though it was not played to the jury. No effort was made to strike the statement. Consequently, it is properly before us and we have reviewed both statements contained on the DVD marked State's Exhibit 5.

A.    I told both my kids -- and you're not out of line -- I told -- because Kate and I talked about it, because he and [my son] are very close and he and I talked about it and [Melany] and I talked about it, and I said, I'll be honest with you, I said many, many times, and I told [Melany] and that's why I kept telling her, it's not your fault it's not your fault. I said, many, many times at night you know, he'd just reach for me or, you know, grab me or something, and I'll, you know, you grabbed me last night, and he'd say, no I didn't, and so that's -- I, why this whole thing is so -- I guess it's surreal to me -- because, you know, [Melany] said, Mom, I don't think he knew it was me, and I said, that does not make a difference. You know, that does not make a difference. So in answer to your question, yes --

Q.    (Interrupting.) Can I be a little more personal here?

A.    Yes, please do --

Q.    Your daughter says he touches her in her privates, rubs and sticks his finger inside of her --

A.    Yeah. Right.

Q.    Has he ever done that to you?

A.    Absolutely. Absolutely.

Q.    That's why I was tryin' to figger out --

Q.    [By Officer 2] While you were sleeping in the middle of the night?

A.    Oh yes, he's woken me up before and I've told him, no . . . and he would not remember it the next day.

Q.    [By Officer 1] Does he take medication?

A.    He does not.[10]

---

[10]We also point out that it is not apparent that this evidence, which clearly was exculpatory in nature, was provided to counsel in time for review and use at trial. *Brady v. Maryland*, 373 U.S. 83 (1963); *Thomas v. State*, 841 S.W.2d 399 (Tex. Crim. App. 1992). At oral argument, neither the State nor appellant's counsel, neither of whom was lead counsel at trial, knew about this statement.

During the examination of Melany at trial, the fact that Melany at some point stated that Whatley may have thought she was his wife was presented to the jury. The State called Melany's mother to the stand to rebut that testimony. So, the State's line of questioning concerned whether Whatley routinely made similar sexual overtures to his wife while sleeping. The mother's testimony at trial greatly minimized such advances, suggesting that he only "once" grabbed her breast. However, years earlier she was asked by the investigating officer, "Has he ever done the same action with you that he has done with her?" She responded, "Yes." She continued, "[M]any, many times at night . . . he'd just reach for me or . . . grab me." When asked more specifically if he had ever touched her private parts, she answered, "Absolutely. Absolutely . . ." but he "would not remember it the next day." She would tell him, "You grabbed me last night," and he'd say, "No[,] I didn't." She further confirmed in the investigator's interview that her daughter said, "Mom, I don't think he knew it was me." The testimony of the mother does not support an inference that Whatley acted voluntarily.

### 5. More Than One Occurrence

Finally, the State argues that since the improper sexual contact occurred more than once, that alone shows Whatley committed these acts voluntarily.[11] But each allegation must be tested on the evidence supporting it. We have thoroughly discussed the testimony of the victim. When the video-recorded statement of the victim was taken, the CAC interviewer took a short break after approximately one hour. When she returned, she asked a final question on the subject

---

[11]The indictment alleged that Whatley penetrated the sexual organ of the child. Likewise, the jury charge required a finding of penetration. The victim testified there was only one incident of penetration of the sexual organ, which occurred in their home in Canton. So, while other incidents of sexual contact were admitted into evidence, they were not incidents of penetration as required by the indictment and jury charge.

31

of Whatley's sleep during the occurrences. She asked, "You told me about several times that step dad Jerry has touched you. Has he ever been awake when he's touching you?" Melany responded, "No, ma'am, he hasn't."

We cannot conclude, based solely on the fact that more than one incident of sexual touching occurred, that the acts were voluntary.

## IV. Conclusion

It is the duty of the jury to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Juries are permitted to draw reasonable inferences from the evidence, but they are not permitted to draw conclusions based on speculation. *Hooper*, 214 S.W.3d at 15. Speculation is the mere theorizing or guessing about the possible meaning of the facts and evidence presented. *Id*. at 16. On the other hand, "an inference is a conclusion reached by considering other facts and deducing a logical consequence from them." *Id*. A conclusion that is reached by speculation may not seem completely unreasonable, but it is not sufficiently based upon facts or evidence to support a conviction beyond a reasonable doubt. *Gross v. State*, 380 S.W.3d 181, 188 (Tex. Crim. App. 2012).

A jury can disregard testimony if it chooses to; it cannot, however, use that testimony to reach the opposite conclusion. The jury's right to disbelieve a witness does not constitute evidence to the contrary. *Johnson v. State*, 673 S.W.2d 190, 196 (Tex. Crim. App. 1984) ("The fact the jury in the instant case was entitled to disregard the accident story to deputy Drewell (and offered by the State) does not mean that the missing elements of the charged offense are

32

supplied by the rejection."); *In re S.B.*, 117 S.W.3d 443, 451 (Tex. App.—Fort Worth 2003, no pet.); *Tippitt v. State*, 41 S.W.3d 316, 326 (Tex. App.—Fort Worth 2001, no pet.).

We must determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict. *Sorrells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011); *Hooper*, 214 S.W.3d at 16–17. "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper*, 214 S.W.3d at 13.

In light of all the evidence, we find the evidence insufficient. The only direct evidence is that Whatley was acting while asleep. Although a jury may make reasonable inferences from the evidence, in this case, the only thing supporting the inference is the complexity of his behavior. The burden was on the State to prove that his actions were voluntary. The State provided no evidence that Whatley was awake or, alternatively, to prove that it was impossible or even unlikely that a sleeping person could behave in such a manner. In the absence of any evidence that would properly allow an inference of conscious, voluntary, volitional (intentional or knowing) behavior by Whatley, the evidence is legally insufficient to support his conviction.[12]

---

[12]In light of our holding that the evidence is insufficient to support the conviction, it is unnecessary to address the court costs and attorney's fee point of error.

33

For the reasons stated in this opinion, we reverse the judgment of the trial court and enter a judgment acquitting Whatley.

Jack Carter
Justice

Date Submitted: July 31, 2013
Date Decided: October 16, 2013

Publish