

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. PD-1627-13

### JERRY DON WHATLEY, Appellant

### v.

### THE STATE OF TEXAS

### ON STATE'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE SIXTH COURT OF APPEALS
### VAN ZANDT COUNTY

JOHNSON, J., delivered the opinion of the Court in which KELLER, P.J., PRICE, WOMACK, KEASLER, HERVEY, COCHRAN, and ALCALÁ, JJ., joined. MEYERS, J., dissented.

## O P I N I O N

A Van Zandt County jury found appellant guilty of aggravated sexual assault of a child by touching and sentenced him to fifty years' imprisonment. On direct appeal, appellant claimed that the evidence was legally insufficient to support his conviction because the state did not offer evidence disputing his claim that he was asleep at the time and that his actions were therefore involuntary. The court of appeals agreed, and it reversed the judgment of the trial court and entered a judgment acquitting appellant. *Whatley v. State*, 415 S.W.3d 530, 548 (Tex. App.—Texarkana

2013). We granted the state's petition for discretionary review,[1] and we now reverse the judgment of the appellate court and remand for consideration of appellant's final point of error.

## I. Facts

Appellant's stepdaughter accused him of touching her inappropriately on three separate occasions when she was ten or eleven years old.[2] The first episode occurred while the family was on vacation at a lake in Arkansas. Appellant, the complainant, and her mother were sharing a bedroom in a rented cabin, and the abuse occurred while appellant and the complainant were alone in the bed. All three family members slept together in the bed that night. The second incident was during the same vacation in a reclining chair, and the third happened in the complainant's bedroom at the family home in Canton, Texas.

This case requires us to decide what the jury could have reasonably inferred from trial testimony. In order to accurately represent the evidence that was available to the jury with regard to appellant's consciousness, we sample generously from the trial transcript.

## A. Testimony of Complainant's Mother

The complainant's mother testified as an outcry witness. She explained that, after the complainant informed her of the abuse, she (the mother) confronted appellant. The complainant was also present, at her own request, because she was concerned that appellant would lie to her mother.

---

[1] The state's ground for review contends that:

The court of appeals disregarded this Court's rules for sufficiency review by not examining the entire record, viewing what it did in a light other than the most favorable to the verdict, dismissing inferences contrary to its own, viewing pieces of evidence in isolation rather than cumulatively, and elevating direct evidence over circumstantial evidence.

[2] Though eighteen years old at the time of trial, the child complainant testified under the pseudonym Melany Carter.

Q:     And did you all talk?
A:     We did.
Q:     What did you say to him?
A:     I said, [Melany] said you've been touching her.
Q:     Did you wait for a response?
A:     He started breathing fast and swallowing and that's when – I think the first time he stood up and said, We've talked about this and she and I resolved it.

III R.R. 130.

## B.  Direct Examination of Complainant

The complainant testified as well.  She was eighteen years old at the time of trial.  Portions of her testimony appear below.

Q:     And was it common or uncommon for the two of you to sleep in the same bed?
A:     Uncommon.
Q:     Uncommon.  Do you know if Jerry was asleep or awake when he touched you?
A:     Well, I was – I had my back facing to him.
Q:     Okay.  So – okay.  Well, describe for me how you and he were laying in the bed.
A:     He was behind me and I had my back facing to him.
Q:     Okay. So his front was to your back?
A:     Uh-huh.
Q:     Okay.  Tell the jury what happened.
A:     He touched my vagina, but he didn't penetrate it.
Q:     Do you recall what you were wearing?
A:     Sleep pants and a shirt.
Q:     Okay.  Do you recall what he was wearing?
A:     Just some shorts.
Q:     Okay.  Did he touch you in any other manner or did he just touch you on your vagina?
A:     He just touched me on my vagina.
Q:     Okay.  Did he say anything to you when that occurred?
A:     No, sir.
Q:     Did you say anything to him when that occurred?
A:     No, sir.
Q:     And you said that he touched, but he did not penetrate.  Can you describe the touch?
A:     It was just light, under my clothes.  He like reached under my clothes and just

kind of rubbed.

Q: Okay. Was it skin-to-skin contact?

A: Yes, sir.

. . .

Q: Did you tell [your mother] what had happened to you?

A: No, sir, I didn't.

Q: Why didn't you?

A: I was afraid.

Q: Afraid of what?

A: And I just – I loved my dad and I didn't want to not see him again.

Q: Is that the only incident that occurred in the cabin on the lake in Arkansas?

A: No, sir.

Q: Where did the other incident occur?

A: We were downstairs in the second living area and I – we were in a recliner chair. I had come down there, I'm not sure for what reason, but we were watching TV. And I came to sit down on the recliner chair arm and he was asleep at the time or falling asleep at the time and we were just watching TV. And his eyes were still closed, but his hand started moving and he made me – he made me touch his penis.

. . .

Q: You said that he made you touch his penis. Was it on top of his clothes or underneath his clothes?

A: Both.

Q: Were his eyes open or closed?

A: Closed.

Q: Did he say anything to you?

A: No, sir.

Q: Did you say anything to him?

A: No, sir.

Q: Did you tell your mom?

A: No, sir.

. . .

Q: Why didn't you?

A: I was afraid.

Q: Afraid of what?

A: Not having a dad.

Q: Hm?

A: Not having a dad.

. . .

Q: Can you recall any other times that Jerry Whatley has touched you inappropriately?

A: Yes, sir.

Q: When was the next time?

A:    At 1520 Woodland Drive in Canton.

Q:    Do you recall about when that was?

A:    Whenever I was ten or 11. I'm not sure what date exactly.

Q:    Where did it occur at 1520 Woodland?

A:    In my bedroom.

Q:    Can you describe how it happened?

A:    He – I was supposed to be doing chores and he would come in and check on me every once in a while. And so I'm not – I don't remember how we ended up where we got laying on the bed, but he had his eyes closed and I guess he was asleep, but we were just laying there. And I was facing towards my window across from my door and he was – he had his front to me and I had my back to him, and he reached around and touched my vagina and he actually penetrated it that time.

Q:    Melany, do you recall if you were clothed or unclothed?

A:    I had clothes on.

Q:    Do you know if he was clothed or unclothed?

A:    He had clothes on.

Q:    Okay, did he say anything to you when he touched you on your vagina?

A:    No, sir.

Q:    Did you say anything to him?

A:    Yes – no, sir.

Q:    You said that his eyes were closed and he appeared to be asleep?

A:    Yes, sir.

Q:    Did you attempt to wake him up?

A:    No, sir.

Q:    Did he penetrate your vagina?

A:    Yes, sir.

Q:    Is that the first time that he had penetrated your vagina?

A:    Yes, sir.

Q:    Is that the only time he penetrated your vagina?

A:    Yes, sir.

Q:    Did you touch him at all during this incident on 1520 Woodland Drive?

A:    No, sir.

Q:    Did you ever talk to Jerry about these times when he touched you inappropriately on your vagina?

A:    Yes, sir.

Q:    Do you recall when you talked to him?

A:    No, sir. Well, sometime after it had happened.

Q:    You said sometime after it had happened. We've talked about a couple different times here. You've told the jury about two times in Arkansas and one time on Woodland.

A:    After the Canton incident.

Q:    After the Canton incident. What did you tell him?

A:  I told him that he had touched me inappropriately.

Q:  Did he say anything to you?

A:  Yes. He told me to tell him next time that he does it and try to wake him up.

. . .

Q:  Did he ever ask you not to tell your mom?

A:  Yes, sir.

Q:  Did he say why you shouldn't tell your mom?

A:  Because he was afraid he would get kicked out.

. . .

Q:  Did you ever end up telling your mom about these times?

A:  Yes, sir, I did.

Q:  Do you remember when you told your mom?

A:  I think it was February, and I was 11 whenever I told her.

. . .

Q:  Do you know if your mom ever confronted Jerry Whatley about the things that you told her that he did to you?

A:  Yes, sir.

Q:  How do you know she did that?

A:  I was there whenever she did it.

Q:  When he was confronted with the things that you said he did to you, did he have anything to say for himself?

A:  Yes.  He said that he didn't do it.

Q:  Anything else?

A:  No, sir, not that I can remember.

Q:  Did you ask to be present during the confrontation?

A:  Yes, sir.

Q:  Why did you want to be present?

A:  Because I didn't want him to lie to my mom.

Q:  Did he ever attempt to lie to your mom during that time?

A:  Yes, he did.

Q:  How did he attempt to lie?

A:  He said that he didn't do what he really did.

. . .

Q:  What happened to Jerry after your mother confronted [him] and you were there?

A:  My mom made him leave.

Q:  Did that bother you?

A:  A little bit.

Q:  Why did it bother you?

A:  Because I didn't have a father figure in my life once and I actually wanted to have a dad.

III R.R. 179-89.

### C. Cross-Examination of the Complainant

On cross-examination, the defense emphasized the defendant's statement to the Children's Advocacy Center (CAC) interviewer, in which Melany appeared confident that appellant was asleep when he touched her.

Q: Do you remember meeting with a woman referred to as a CAC interviewer in Tyler?

A: Yes, sir.

Q: I'm sorry, I didn't hear you.

A: Yes, sir.

Q: So you remember those events clearly?

A: Yes, sir.

Q: Do you remember telling the CAC interviewer that you referred to him as dad?  Jerry – you referred to Jerry Whatley as "dad"?

A: Yes, sir.

Q: Do you remember telling, Dad was asleep?

A: Yes, sir.

Q: So do you also remember telling her that, I got in bed with him and I guess he thought I was mom?

A: No, sir.

Q: You don't remember saying that?

A: No, sir.

Q: Do you remember saying his eyes were closed and he was snoring?

A: Yes, sir.

Q: Do you remember saying, I don't think he knows what – he knew what he was doing to me? Do you remember saying that?

A: Yes, sir.

Q: I believe also – do you remember saying, He stops when I wake him up?  Do you remember saying that?

A: No, sir.

Q: You don't remember saying that specifically, but you've consistently said that you believe that Jerry Whatley was asleep during all these incidents, didn't you?

A: Yes, sir.

Q: Is it fair to say that you have some doubts whether he was knowingly and intentionally hurting you?

A: No, sir, I don't have any doubts.

Q: But you testified that he was asleep, correct?

A: Yes, sir.

Q: All right.  So you testified that you would get in bed with him when he was

sleeping during these occasions?

A: No, sir, I would not get in bed with him.

Q: But you did testify that he was sleeping during these times?

A: Supposedly asleep.

Q: You said you told the CAC interviewer that he was sleeping and he didn't know what he was doing to you. You did tell that to the CAC interviewer?

A: Yes, sir, I did.

III R.R. 191-93.

## D. Re-Direct Examination of Complainant

Re-direct examination of the complainant focused on the facts she observed during the assaults, rather than what she, at eleven years old, took those facts to mean.

Q: Melany, [defense counsel] was talking about the CAC video wherein you went to Smith County, was interviewed by a forensic interviewer. Do you recall him asking you questions about that?

A: Yes, sir.

Q: And a lot of other things like he appeared to be asleep, I don't guess he knew it was me or what he was doing. And what he said lastly was, He stops when I wake him up; is that correct?

A: Yes, sir.

Q: About how long would it take, if you remember, for Jerry Whatley to go to sleep before his hands ended up on your vagina or in your vagina?

A: A few minutes.

Q: A few minutes?

A: Yes, sir.

Q: So it's not like you were laying in there hours upon hours upon hours?

A: No, sir.

Q: In just a few minutes, he was asleep enough – you felt like he was asleep that maybe he thought you were – you were your mother?

A: Yes, sir.

III R.R. 196-97. The defense did not re-cross examine the complainant. III R.R. 198.

## E. Direct Examination of Complainant's Mother Upon Being Recalled

The state recalled the complainant's mother in order to ask her about appellant's sleeping habits.

Q:      Ms. Whatley, was – Ms. Stringer, was Mr. Whatley a fast sleeper?

A:      Pardon me?

Q:      Was he a fast sleeper?  Did he go to sleep real fast?

A:      Sometimes.

Q:      And would he enter a real heavy sleep within a minute or two?

A:      No, sir.

Q:      How would you know that?

A:      Because I slept with him.

Q:      You slept with him, didn't you?

A:      Yes, sir.

Q:      How many years did you sleep with him?

A:      Five.

Q:      So in your five years of experience of sharing a bed with this man you feel like you know his sleep habits?

A:      Yes, sir.

Q:      Did Jerry Whatley ever roll over to you after a minute or two asleep and stuck [sic] his finger in your vagina?

A:      No, sir.

. . .

Q:      Had Mr. Whatley ever made a sexual advance to you while he appeared to be asleep?

A:      Yes.

Q:      Can you describe that?

A:      I got into bed – he had gone to bed before me.  I got into bed.  He rolled over and touched my breast and I pushed his hand away and I said, Not tonight, or, Don't, and he rolled back over.

Q:      Did he appear to be asleep?

A:      I can't say for sure.

Q:      Were his eyes closed?

A:      Uh-huh.

Q:      Was he snoring?

THE COURT: Is that a "yes"?

THE WITNESS: I'm sorry.

A:      Yes, his eyes were closed.  No, he was not snoring.

Q (BY [THE PROSECUTOR]):      How long did it take him to respond to your rejection?

A:      Right away.

Q:      You didn't have to wake him up?

A:      No, sir.

Q:      He didn't appear to be groggy?

A:      No, sir.

Q:      He didn't say anything to you that gave you the impression that he was out of it?

A:      No, sir.
Q:      This happened one time in your four and a half to five years of marriage?
A:      Yes, sir.

III R.R. 200-02.

## II. Discussion

A defendant commits aggravated sexual assault of a child if he intentionally or knowingly causes the penetration of the sexual organ of a child younger than fourteen years of age by any means. TEX. PENAL CODE §§ 22.021(a)(1)(B)(i), (a)(2)(B). However, "the issue of the voluntariness of one's conduct, or bodily movements, is separate from the issue of one's mental state." *Adanandus v. State*, 866 S.W.2d 210, 230 (Tex. Crim. App. 1993). Section 6.01(a) of the Texas Penal Code requires a voluntary—i.e., volitional—act as an element of guilt. TEX. PENAL CODE § 6.01(a) ("A person commits an offense only if he voluntarily engages in conduct, including, an act, an omission, or possession."). This is a distinct inquiry from the knowing or intentional *mens rea* requirement established by the provisions of § 22.021(a)(1)(B).

> "Voluntariness," within the meaning of Section 6.01(a), refers only to one's own physical body movements. If those physical movements are the nonvolitional result of someone else's act, are set in motion by some independent non-human force, are caused by a physical reflex or convulsion, or are the product of unconsciousness, hypnosis, or other nonvolitional impetus, that movement is not voluntary.

*Rogers v. State*, 105 S.W.3d 630, 638 (Tex. Crim. App. 2003).

"In determining whether the evidence is legally sufficient to support a conviction, a reviewing court must consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational fact finder could have found the essential elements of the crime beyond a reasonable doubt." *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011), *citing Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979).

This "familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "Faced with a record of historical facts that support conflicting inferences, the reviewing court must presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Padilla v. State*, 326 S.W.3d 195, 200 (Tex. Crim. App. 2010), *quoting Jackson*, 443 U.S. at 326 (internal quotation marks omitted; omission in original).

"[A]n inference is a conclusion reached by considering other facts and deducing a logical consequence from them." *Hooper v. State*, 214 S.W.3d 9, 16 (Tex. Crim. App. 2007). Viewing the evidence in the light most favorable to the verdict,[3] we decide that the evidence presented to the jury, along with reasonable inferences therefrom, was sufficient to support a finding beyond a reasonable doubt that appellant's actions were voluntary under Section 6.01(a).

In her Children's Advocacy Center (CAC) interview, which was conducted when she was eleven years old, the complainant seemed convinced that appellant had been asleep because his eyes were closed and he was snoring. When she testified at age eighteen, however, the complainant acknowledged that she had been unable to see appellant's face when they were in bed because her back was facing him. Further, at trial, she was skeptical of the idea that appellant was unaware of his actions.[4] She also testified at trial that she did not immediately tell her mother about the abuse because she was afraid of losing appellant as a father figure.

The complainant theorized that appellant may have sleepily mistaken her for her mother.

---

[3] *Gear*, 340 S.W.3d at 746.

[4] E.g., "Supposedly asleep." III R.R. 193.

However, the complainant's mother testified that, in the five years she had shared a bed with appellant, he only once reached for her in his sleep, and on that occasion he did not touch or penetrate her vagina. From this testimony, a reasonable jury could have inferred that the child complainant mistook appellant's closed eyes and heavy breathing for sleep.

At trial, when she was eighteen, the complainant stated that she had no doubt that the appellant knew he was hurting her. III R.R. 192-93. A reasonable jury could have inferred from her testimony that as a child she was trying to reconcile her love for her "father," as well as her more general desire for a father figure, with his abuse of her and, in doing so, convinced herself that he was unaware of his actions. The complainant's fear at age eleven that appellant would lie and deny his actions when initially confronted by the complainant's mother implies that the complainant had some belief in appellant's intentions near the time of the incidents as well. Appellant would necessarily have had to know what he did in order to lie about it, as she was afraid he might.

The complainant's mother's testimony that appellant did not reach for her while asleep also tends to discredit the theory that he may have thought the complainant "was mom." Even if the mother had testified that appellant routinely reached for her in his sleep while in bed, the incongruity of touching the complainant while in a recliner chair would undermine any support that such a pattern offered to that theory of the facts.

The conflicts in the testimony by the complainant and her mother about the rapidity of appellant's descent into sleep could also lend some support to an inference that he was not asleep when he touched the complainant. A reasonable jury could have had difficulty believing that the appellant, who only "sometimes" fell asleep quickly while in bed with his wife, was so deeply asleep within minutes on three different occasions that he unconsciously undertook the dexterous action

of putting his hands inside the complainant's pants.

Each of these possible inferences alone may not have been enough to find appellant guilty beyond a reasonable doubt. However, a reasonable jury could have made some or all of these inferences, which, in the aggregate, would support a conviction.

### III. Conclusion

Viewing the evidence in the light most favorable to the verdict, we conclude that a jury could have reasonably inferred that appellant was awake, but feigning sleep, when he inappropriately touched the complainant and that his actions were therefore voluntary under Section 6.01(a) of the Texas Penal Code. Accordingly, we reverse the judgment of the court of appeals and remand the cause to that court so that it may address appellant's final point of error.[5]

Delivered: October 8, 2014
Publish

---

[5] *See Whatley*, 415 S.W.3d at 548 n.12 ("In light of our holding that the evidence is insufficient to support the conviction, it is unnecessary to address the court costs and attorney's fees point of error.").