**MODIFY and AFFIRM; and Opinion Filed July 7, 2015.**



**In The**

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-13-01640-CR

### STEVE ACOSTA, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the 194th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F-1355987-M**

## MEMORANDUM OPINION

Before Justices Francis, Lang-Miers, and Whitehill
Opinion by Justice Lang-Miers

A jury convicted appellant Steve Acosta of the offense of burglary of a habitation. Appellant pleaded not true to an enhancement alleging a prior conviction for aggravated robbery with a deadly weapon. The court found the enhancement paragraph true and sentenced appellant to twelve years in prison. In one issue on appeal, appellant argues that the evidence was insufficient to support the conviction. Because the issues are settled, we issue this memorandum opinion. TEX. R. APP. P. 47.4. We modify the trial court's judgment and affirm as modified.

### BACKGROUND

Patricia Ortega—a neighbor who lived two houses from the complainant Juan Depena—testified that, about noon on the day of the alleged offense, she saw through her kitchen window

that there was a woman and a man in her neighbor Mr. Garibaldi's house. Garibaldi's house lay between her house and the complainant's house. She testified that he was a Hispanic man and that she saw "the young man . . . from behind, not from the front" and never saw his face. Ortega also testified that the man left Garibaldi's house, "pushed the air conditioner" unit at the complainant's window, "and went in[.]" Ortega testified that she called 911 and reported that someone had entered her neighbor's house. She also testified that she did not see anyone else enter or anyone leave the complainant's house (although she admitted on cross-examination that she was not watching consistently) and that the police arrived in about fifteen minutes.

On cross-examination, Ortega testified that the man who entered the complainant's house was wearing a long t-shirt that she thought was white. Ortega testified that the woman she saw in Garibaldi's house was the daughter of her neighbor Garibaldi and that, when the man entered the complainant's house, the woman went outside Garibaldi's house and acted like she was working in the yard. Ortega also testified that she did not know if anyone entered or exited the complainant's side door to his house because she did not have a good view of that side door.

The complainant testified that, after the police informed him by phone that his house had been burglarized, he arrived at his house and found the door broken and "everything . . . tossed around" in the house. He testified: "[E]verything was upside down. The clothes were thrown about. The drawers were pulled out and had been thrown on the floor. There was nothing—for example, nothing of value, everything was messed up." He also testified that he noticed that his forty-seven inch television set was missing and also that items were in his kitchen collected in a black garbage bag. He testified that he had not given anyone permission to be in his house or to collect and take items or attempt to take items from his house.

Dallas Police Officer Christopher Klein testified that he was about a minute away from the complainant's residence when he received a call regarding the burglary in progress. The call

relayed that a "Latin male had entered the house and there was a Latin female out front of the house." After he arrived at the house, as an undercover officer, he remained in his car parked across the street, watching the house and waiting for uniformed police officers to arrive. He testified that he could see three sides of the house and that he did not observe anyone entering or exiting the house from the time that he arrived at the scene until uniformed officers arrived within fifteen minutes. He observed a Latin female—subsequently identified as Melissa Garibaldi—in the yard next door to the complainant's house. Klein testified that, after uniformed police arrived, the officers observed that a side door of the house was open. He and two other officers "just pushed that side door open and announced Dallas Police" and "at that point" they "saw Mr. Acosta standing inside the house" in the living room. Klein identified appellant in the courtroom as the person whom he had observed in the complainant's living room when officers entered. Klein testified that appellant complied when police requested that he put up his hands and lay on the floor. He testified that the "house had been ransacked" with "property stacked by the door inside a black trash bag" in the kitchen, and "stuff all over the place" with drawers pulled out, furniture moved, and the mattress taken off the bed. He testified that officers also observed an air conditioning unit not at a window but "inside the kitchen." Klein also testified that, after the initial burglary report, the complainant stated that a couple of television sets were missing and testified that officers searched unsuccessfully for them.

On cross-examination, Klein testified that appellant was wearing a blue shirt and blue jeans and that, when appellant put up his hands upon police request, appellant "said that someone was chasing him." Klein testified that he did not see anyone else in the house and that officers did not search the area looking for the person purportedly chasing appellant. When asked if someone who was "not there" could have taken the televisions, Klein testified that "[c]ould have been." Klein also testified that he did not recover burglary tools from appellant, but that he did

not "know if [he had] ever caught anybody with screwdrivers" in the "burglary of a house" and that most burglars of houses "just kick the door in."

On redirect examination, Klein testified that appellant described the people chasing him as "[b]lack guys" but that Klein did not observe any African-American males near the house nor did the eyewitness. Klein also testified that the distance from the complainant's house to the neighbor's house could "be traveled multiple times in a period of three minutes[.]"

Detective Ronald Kramer with the Dallas Police Department testified that he arrived at the scene seconds after Klein, and he and Klein maintained surveillance of the house until uniformed officers arrived. He testified that he saw no one enter or exit the house and that, during his investigation of the burglary, he did not learn of "any other individual exiting or entering the house[.]" Kramer testified that, when police found appellant standing in the middle of the complainant's living room and identified themselves to appellant, appellant "seemed very calm, not upset" and he was not sweating or out of breath. Kramer testified that appellant stated, "Some guys were chasing me, so I ran in here to hide." Like Klein, Kramer did not see "[a]ny one of African-American race" in the general area and testified that appellant's physical condition did not indicate that he was being chased. Kramer also testified that the disarrayed condition of the house was consistent with a burglary. Kramer identified appellant in the courtroom as Steve Acosta and he testified that he transported appellant to the police station.[1]

On cross-examination, when asked if in ten minutes (which was, according to police call notes, the approximate time from the time of the 911 call until appellant was in custody) someone could have entered and ransacked the house, checked the dressers, flipped the mattress, put clothes in a bag and put the bag in the kitchen, and removed two televisions, Kramer testified

---

[1] Kramer testified that he also transported Melissa Garibaldi to the police station because "the original caller stated that she may have been involved, acting as a lookout" but she refused to talk and, because Kramer "did not have enough to prosecute her[,]" she was released.

–4–

that "[a]ll that stuff that happened, it didn't happen in that ten-minute time frame" and "[i]t would have taken several trips." But in answer to whether the ten-minute time frame on the police call notes was "a good time frame," Kramer testified that the call notes reflect "just the time that the witness, whenever she got home, observed the first strange incident" and that "there was a whole [other] rest of the day before that."

The jury found appellant guilty and the court sentenced appellant to twelve years' imprisonment. This appeal followed. The State did not file a brief in this Court.

### APPLICABLE LAW AND STANDARD OF REVIEW

In reviewing a challenge to the sufficiency of the evidence to support a conviction, we must consider all the evidence and reasonable inferences therefrom in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Whatley v. State*, 445 S.W.3d 159, 166 (Tex. Crim. App. 2014). We determine whether inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the jury's verdict. *Goad v. State*, 354 S.W.3d 443, 450 (Tex. Crim. App. 2011).

A person commits burglary of a habitation when the person, without the effective consent of the owner, enters a habitation with intent to commit a theft. TEX. PENAL CODE ANN. § 30.02(a)(1) (West 2011). Intent is a fact issue for the jury and may be inferred from the circumstances. *Robles v. State*, 664 S.W.2d 91, 94 (Tex. Crim. App. 1984). It is not necessary for the State to prove a theft was actually committed or the appellant possessed the stolen property. *See Richardson v. State*, 888 S.W.2d 822, 824 (Tex. Crim. App. 1994). Because the entry of the habitation is an intrusion into the occupant's reasonable expectation of privacy, the harm results from the entry. *Id.*

–5–

## ANALYSIS

In his sole issue, appellant argues that the evidence was insufficient to support the conviction because there was no evidence that would give rise to the reasonable inference that appellant had the required intent to commit theft. He does not dispute that he entered the complainant's house. But appellant argues that there was no evidence tying him "to the stolen television(s) or the ransacking of the home or the placing of clothing into a garbage bag." He contends that the "sole factor" tying appellant to the alleged offense was his entry into the house.

The jury heard evidence that appellant entered the complainant's house by pushing through a window air conditioning unit and going through the window, that—upon their entry into the house—police officers observed appellant standing in the living room. The jury also heard evidence that the house was ransacked with "stuff all over the place" with pulled-out drawers, a flipped mattress, items gathered in a garbage bag by the kitchen door, and televisions missing. And the jury heard evidence that appellant compliantly raised his hands upon request by the police and stated that "black guys" had been chasing him, but that officers had not seen any African-American men in the area and appellant appeared calm and not sweating or out of breath. The jury also heard evidence that police officers and a witness had not observed anyone entering or exiting the house from the time of the 911 call to appellant's arrest. Based on this evidence, the jury could reasonably conclude that appellant intended to commit theft. *See Gear v. State*, 340 S.W.3d 743, 747–48 (Tex. Crim. App. 2011) (concluding jury could reasonably infer that appellant intended to commit theft where evidence showed that appellant was interrupted while attempting to enter the complainant's house immediately after breaking the complainant's window, and then ran). Having reviewed the evidence under the appropriate standard, we conclude that it is sufficient to support the jury's verdict. We resolve appellant's sole issue against him.

### CLERICAL ERROR IN JUDGMENT

The judgment in this case spells appellant's first name "Steva." At the beginning of trial court proceedings, the judge confirmed with appellant that the correct spelling of his first name is "Steve." The notice of appeal also spells appellant's first name "Steve." We have the power to modify a judgment when we have the necessary information to do so. *See* TEX. R. APP. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993). Accordingly, we modify the judgment to correct the spelling of appellant's first name to "Steve."

### CONCLUSION

We affirm the trial court's judgment as modified.


/Elizabeth Lang-Miers/
ELIZABETH LANG-MIERS
JUSTICE


Do Not Publish
Tex. R. App. P. 47.2(b)

131640F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

STEVE ACOSTA, Appellant

No. 05-13-01640-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 194th Judicial District Court, Dallas County, Texas
Trial Court Cause No. F-1355987-M.
Opinion delivered by Justice Lang-Miers, Justices Francis and Whitehill participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** to correct the spelling of appellant's first name to "Steve."

As **MODIFIED**, the judgment is **AFFIRMED**.

Judgment entered this 7th day of July, 2015.

–8–