

# NUMBER 13-20-00189-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**SEAN RODRIGUEZ OSBORN,**                                **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                         **Appellee.**

---

### On appeal from the 216th District Court
### of Kerr County, Texas.

---

## MEMORANDUM OPINION

### Before Justices Benavides, Longoria, and Tijerina
### Memorandum Opinion by Justice Tijerina

Appellant Sean Rodriguez Osborn appeals his conviction for possession of a controlled substance in penalty group one, namely methamphetamine, in the amount of four grams or more but less than 200 grams, a second-degree felony. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.115(a), (b). Osborn received a five-year sentence of confinement for this conviction. By one issue, Osborn contends that the evidence is

insufficient to support the jury's finding that he possessed the contraband.[1] We affirm.[2]

## I.   PERTINENT FACTS[3]

Shiloh Edwards, "a caregiver for people who are developmentally disabled," testified that on November 20, 2018, at approximately 3:00 a.m., she heard "a loud bang" at a neighbor's residence. Edwards was providing home service to her clients, who live in a home located in the same neighborhood where Osborn's residence is located. Edwards stated that she heard a second bang that she recognized as a gunshot. According to Edwards, at approximately 5:00 a.m., she saw "a shadow" at Osborn's residence, and she heard shouting. Edwards called 911, and officers were dispatched to Osborn's residence.

Kris Keller, an officer with the Kerrville Police Department, testified that he was dispatched to Osborn's residence to investigate gunshots. Officer Keller stated that when he arrived at Osborn's residence, he observed the front door open, and he saw a gun on the floor. According to Officer Keller, Osborn was throwing household items at the police officers at the scene, and he was talking to himself. The State played a video of Officer Keller's body camera for the jury during his testimony. In the video, Osborn can be heard yelling and appears to be having a conversation with someone named "Rusty" who was

---

[1] The Fourth Court of Appeals in San Antonio, Texas transferred this cause to our Court pursuant to a docket equalization order from the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001.

[2] This cause was tried to the jury along with three other charged offenses. Those offenses include, appellate cause number 13-20-00190-CR, which is for aggravated assault, and two other causes not before this Court and not at issue in this appeal.

[3] The bulk of the witnesses' testimony pertained to the aggravated assault of a public servant cause, and some of the evidence pertained to the other two charged offenses not before us; therefore, we will not discuss those facts in detail, as they are not relevant to this cause.

2

not present. The evidence established that only Osborn and his child were in the home during the incident. The State asked Officer Keller to describe Osborn's demeanor; Officer Keller said, "I believe it was common with being intoxicated on methamphetamine from my job as a patrol officer." The State asked Officer Keller to explain, and he replied, "Being paranoid, talking to someone that's not there, angry. Those [behaviors]." Officer Keller stated that he did not go into Osborn's home, and he did not arrest Osborn.

Harold Degenhardt, a sergeant with the Kerrville Police Department, testified that Osborn was arrested when he eventually came out of his house. The State asked Sergeant Degenhardt to describe Osborn's behavior. Sergeant Degenhardt stated, "That day, I would say, my experience as a police officer, it would be some kind of narcotics-induced psychosis." The State asked Sergeant Degenhardt to explain; he replied, "Seen it countless times before . . . [they] can't be reasoned with, [they are] just out of control, [his behavior was] totally different than his demeanor now." Sergeant Degenhardt believed that Osborn was paranoid, which according to Sergeant Degenhardt is common in people suffering from narcotics-induced psychosis. Sergeant Degenhardt stated that Osborn's behavior was consistent with a person who has used methamphetamine.

Jesse Baldwin, an officer with the Kerrville Police Department, testified that when he arrived at Osborn's residence, he "heard loud screaming, yelling, and obscenities coming just from within the threshold of the residence." The State asked Officer Baldwin to characterize Osborn's actions. Officer Baldwin replied, "To me, due to my experience in the profession of law enforcement, to me it appeared that there was some sort of delusion. There was some sort of anxiety, high anxiety, paranoia, that sort of thing." The

State asked, "And in your experience, what is that consistent with?" Officer Baldwin said, "In my professional law enforcement experience, anytime that I've encountered someone with these types of demeanors, being highly paranoid, altered mental status, specifically the paranoia is a big one, and delusion, that's normally an interaction I have with someone that is under the influence of methamphetamine."

According to Officer Baldwin, Osborn eventually surrendered, and although Officer Baldwin did not recall every item Osborn was wearing, Officer Baldwin said that what stood out to him was that Osborn was wearing a construction hat and a coat. Officer Baldwin heard Osborn yell "there's two more in the attic"; however, upon his search of the home, no one was in the attic.

Ryan Cockrell, a sergeant with the Kerrville Police Department, testified that he helped apprehend Osborn. The State asked Sergeant Cockrell to describe Osborn's appearance. Sergeant Cockrell said,

> He looked disheveled . . . just kind of like someone who's been up all night, but wide-eyed. And I felt like, at the time, that him saying that there was [sic] people climbing around in his attic, and what information I had about the call so far from officers on the scene, was that he was probably paranoid or seeing things that weren't there.

The State asked, "And generally, what is that [behavior] consistent with, based on your experience?" Sergeant Cockrell responded, "That they've been using methamphetamine." Sergeant Cockrell testified that he asked Osborn if he had used methamphetamine, and Osborn replied that he had not used methamphetamine but had "smoked marihuana earlier."

4

Daniel Haas, a sergeant with the Kerrville Police Department, testified that Osborn was acting "[v]ery erratic, paranoid, [making] weird comments" and that it appeared that Osborn was under the influence of methamphetamine. The State asked Sergeant Haas to elaborate. Sergeant Haas responded, "My training and experience. People that are under the influence of methamphetamine, they will exhibit paranoia, erratic movements, just very unpredictable." Sergeant Haas testified that he had encountered similar behavior on numerous occasions in others who had been under the influence of methamphetamine. According to Sergeant Haas, after a prolonged stand-off, Osborn was arrested.

Jimmie Dresden Mitchell, a child protection investigator with the Department of Family and Protective Services (CPS), testified that she investigated the facts of this case because Osborn's four-year old child was at Osborn's residence on November 20, 2018, when Osborn was arrested. Mitchell stated that she contacted Osborn in the Kerr County Jail. The State asked Mitchell to describe how Osborn appeared to her. Mitchell replied as follows:

> Well, descriptive-wise from what I observed, he was very disheveled. His hair was, you know, kind of all over the place, wasn't brushed. I had previously known him from prior cases, and he appeared that he had lost a whole lot of weight. He had scabs, various scabs on his face and his arms, to me, that were, through my training and experience, indicative of picking. Which it is a common sign of methamphetamine use.

Mitchell testified that she has encountered numerous people who use methamphetamine and that she has observed similar characteristics in those people. According to Mitchell, she asked Osborn if he used drugs, and he responded that he does. Specifically, Mitchell said, "Mr. Osborn reported that . . . he uses

5

methamphetamine, mostly cocaine and marijuana, and he stated that he smokes marijuana like he smokes cigarettes, which is all the time." The State asked if Osborn talked about this case. Mitchell replied, "Yes, he did. I asked him what was going on? And . . . that was when he admitted that he was using meth, cocaine, and marijuana, and that the house made him do it." According to Mitchell, Osborn refused to take a drug test. However, Osborn permitted CPS to test his child for drugs. The trial court admitted the lab report of the child's hair follicle drug test performed on December 5, 2018, showing that the child tested positive for methamphetamine.

Gary Stephens, an officer with the Kerrville Police Department who is the custodian of evidence, testified that a bong and "a propane small torch" were found in "a back bedroom in the west back corner of the residence." Officer Stephens stated that the bong contained a liquid which he emptied into a sterile container and sent to the lab for testing. Officer Stephens testified that another bong that resembled a "Gatorade bottle" was found also containing a liquid which "was also taken to the police department[,] placed into a sterile container[,] and transported to [the lab]." The liquid from the first bong was tested and found to contain 60.26 grams of methamphetamine.

James Machetta, an investigator with the Kerrville Police Department, testified that he asked Osborn if anyone else lived at his residence and Osborn said, "No." Investigator Machetta clarified that "whenever I asked him in the interview, he said it was just [his child] and hi[m] . . . those were the only two that lived in that residence."

Osborn called Chrystal Barraza during his case-in-chief. Barraza testified that she stayed at Osborn's residence "off and on" to take care of his child. Barraza said that she

would stay the night when Osborn had to leave early. Barraza stated that another woman named Cassandra Moreno moved in with Osborn at the residence. Barraza testified that she used methamphetamine, and she saw both Moreno and Osborn using it too. However, according to Barraza, she never saw Osborn use methamphetamine in front of his child.

Barraza testified that on November 20, 2018, she went to Osborn's residence at approximately 4:00 a.m., put some laundry in the dryer, and went to bed. Subsequently, Barraza stated that Moreno woke her up. Barraza explained:

> [Moreno] came and said, [Barraza], you need to get up. [Osborn's] acting crazy. He's making a lot of noise. So I came out and he was walking down the hallway with this pole, banging against the wall. And I said, [Osborn], what are you doing? [Your child is] sleeping. And he didn't answer me. And so I was like, I'm sick of this shit. I grabbed my purse off the table and I walked out the door.
>
> . . . .
>
> So I walked out, got to my car. I was looking for my phone to call his mom. I couldn't find my phone. And as I was coming back up to go up the sidewalk, [Moreno] and two guys [Mario and Chilly] were running out of the house [because Mario told Barraza that Osborn was shooting his gun].

Barraza stated that she gave the group a ride when she left the residence.

Barraza testified that the bong found by police belonged to Moreno and that it did not belong to Osborn. According to Barraza, the room where the bong with the methamphetamine was found was Moreno's bedroom. Barraza acknowledged that some of the drawers in the dresser in that room contained Osborn's child's clothing.

On cross-examination by the State, Barraza testified that she used methamphetamine, but she did not smoke it. Barraza stated that although she never used

7

methamphetamine with Osborn, on one occasion, she saw him smoke methamphetamine with a "little pipe." The State asked Barraza if Osborn used a pipe that resembled the "Gatorade pipe" found in his residence, and she replied, "Yeah, just a pipe like that."

Osborn testified that although he used methamphetamine, the methamphetamine found in his residence did not belong to him. Osborn acknowledged that he had previously ingested methamphetamine as follows:

> Usually I would do what is called parachuting, and that's either where you take a piece of tissue and put a shard or a crystal of meth in there and swallow it. Or I would put it into pill form and take it kind of like Adderall. I did smoke it occasionally, but ingesting it through my mouth was my biggest thing because it didn't draw too much attention.

Osborn denied that his behavior on November 18, 2018, was induced by methamphetamine. Osborn blamed his behavior on the following:

> I heard some commotion across the house. Actually I heard commotion out in my backyard, which led me to get up. And when I get up, I hear male voices across my house. And I know that only two females [and my child] are in my house. So it kind of put me on alert that there's two male voices. I open up my door and I'm met right there in the hallway, first Chrystal, then Cassandra, and two males directly behind them.
>
> . . . .
>
> I met them in the hallway. . . . I followed them into what my [child] calls her room, which is, whenever I'm watching her, that's where her videos, that's her day room kind of thing. And I see drug paraphernalia everywhere. At that point I told them that they needed to leave. I turn around to go back to be with my daughter, and the two males were following me down the hall. And I told them, y'all need to leave. I already asked y'all to leave. And in that instance is when they became aggravated, I guess you would say. I turned around, told one of them, said, look, you need to go.
>
> . . . .
>
> There was a point where . . . they were trying to make it okay for them to be there, which I wasn't allowing it after what I had seen. They became

8

combative. I turned around. I asked them to leave again. They went to strike me physically. I pushed them away. I went back into my room . . . .

. . . .

So I come back in and I sit down in the rocking chair after being threatened. I couldn't go back to sleep, so I'm sitting there and I hear somebody walk back behind me.

. . . .

At that point I turned around and I could see somebody looking into the window because . . . there's blinds but they're kind of see-through kind of like my shirt.

Osborn stated that he pointed his finger at the person at his window, the person ducked down, and Osborn went to get his gun. Then Osborn "hit" the side of the wall and said, "if you're still there, you need to leave." Osborn testified that he heard somebody "chamber a round" in a pistol, he felt fear, and he shot his gun emptying the whole magazine. Osborn clarified that he shot sixteen times.

Osborn testified on cross-examination that he started a fire in his bathroom sink prior to the arrival of the police because he had found a white washcloth that he believed had methamphetamine, and he did not want his child to find it. Osborn did not explain how he found the washcloth, and he claimed that he had guessed that the moisture on the washcloth was methamphetamine. Osborn acknowledged that the room where the contraband was discovered was his child's room, and that the dresser where the contraband had been located contained his child's clothing, among other things. Osborn admitted that he had previously used methamphetamine at his residence by smoking it.

The jury found Osborn guilty of the charged offense. This appeal followed.

## II. STANDARD OF REVIEW

In determining the sufficiency of the evidence, we consider all the evidence in the light most favorable to the verdict and determine whether a rational fact finder could have found the essential elements of the crime beyond a reasonable doubt based on the evidence and reasonable inferences from that evidence. *Whatley v. State*, 445 S.W.3d 159, 166 (Tex. Crim. App. 2014); *Brooks v. State*, 323 S.W.3d 893, 898–99 (Tex. Crim. App. 2010) (plurality op.). The fact finder is the exclusive judge of the facts, the credibility of witnesses, and the weight to be given their testimony. *Brooks*, 323 S.W.3d at 899. We resolve any evidentiary inconsistencies in favor of the judgment. *Id.*

Sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). "Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Villarreal*, 286 S.W.3d at 327; *see Malik*, 953 S.W.2d at 240.

A person commits the offense of possession of a controlled substance if that person knowingly or intentionally possesses a controlled substance listed in penalty group 1 of the Texas Health and Safety Code. *See* Tex. Health & Safety Code Ann. § 481.115(a), (b). Methamphetamine is listed as a controlled substance in penalty group 1. *See id.* § 481.102(6).

"When the contraband is not in the exclusive possession of the defendant, a fact finder may nonetheless infer that the defendant intentionally or knowingly possessed the contraband if there are sufficient independent facts and circumstances justifying such an inference." *Tate v. State*, 500 S.W.3d 410, 413–14 (Tex. Crim. App. 2016); *see Poindexter v. State*, 153 S.W.3d 402, 405–06 (Tex. Crim. App. 2005). Texas courts have recognized many non-exhaustive factors that may, either singly or in combination, show the accused's affirmative link to contraband. *Tate*, 500 S.W.3d at 414. Such factors include, among others, (1) the defendant's presence when a search was conducted, (2) whether the contraband was in plain view, (3) the defendant's proximity to and the accessibility of the narcotics, (4) whether the defendant attempted to flee, (5) whether other contraband or paraphernalia were present, (6) whether the defendant was under the influence when arrested, and (7) whether the conduct of the defendant indicated a consciousness of guilt. *Evans v. State*, 202 S.W.3d 158, 162 n.12 (Tex. Crim. App. 2006). "A person need not have exclusive possession of a controlled substance in order to be guilty of possession—joint possession will suffice." *Hughitt v. State*, 539 S.W.3d 531, 538 (Tex. App.—Eastland 2018), *aff'd*, 583 S.W.3d 623 (Tex. Crim. App. 2019) (citing *McGoldrick v. State*, 682 S.W.2d 573, 578 (Tex. Crim. App. 1985)). "Affirmative links tend to establish that the accused's connection with the contraband was more than just fortuitous." *Barbosa v. State*, 537 S.W.3d 640, 645 (Tex. App.—San Antonio 2017, no pet.) (internal quotations omitted) (citing and quoting *Gill v. State*, 57 S.W.3d 540, 544 (Tex. App.—Waco 2001, no pet.); *Harris v. State*, 994 S.W.2d 927, 933 (Tex. App.—Waco 1999, pet. ref'd)).

11

## III. DISCUSSION

By his sole issue, Osborn contends that the evidence is insufficient because there were no affirmative links connecting him to the contraband. Specifically, Osborn argues that the evidence showed that other people lived at the house where the contraband was found, there was no evidence that he was intoxicated, and mere presence at the location where contraband is found is not enough to support a conviction.

First, Osborn argues that because he was not alone in the home where the contraband was found by police, we must determine whether additional independent facts and circumstances affirmatively link him to the contraband in such a way that it can be concluded that he had knowledge of the contraband and exercised control over it. Osborn's affirmative link argument is premised on a finding that he was not alone when the contraband was discovered. Here, however, the jury was free to disbelieve Barraza and Osborn that she and three other people were in his home prior to the police finding Osborn alone at his home with the bong containing methamphetamine. And the jury was free to believe police testimony that only Osborn and his child were present in the home when the contraband was discovered.

In addition, Osborn argues that the evidence shows that he was not in exclusive possession of the place where the contraband was found because Barraza and Moreno lived with him and used the room where the contraband was discovered. However, again, the jury could have disbelieved Barraza's and Osborn's testimony that the women used the room where the contraband was found and that the contraband belonged to Moreno. Nonetheless, even assuming that the jury believed that Barraza and Moreno lived with

12

Osborn and were there the day before police found the contraband, we conclude as further explained below that additional independent facts and circumstances affirmatively link Osborn to the contraband in such a way that it can be concluded that he had knowledge of the contraband and exercised control over it. *See Tate*, 500 S.W.3d at 414.

The additional independent facts and circumstances here show that the bong with the methamphetamine was discovered in plain view on a dresser used by Osborn's child, and it was conveniently accessible to Osborn. *See Tate*, 500 S.W.3d at 417 (finding a link when the drugs and syringe were in plain view and conveniently accessible to the appellant). The evidence showed that Osborn was legally residing on the premises as Osborn testified that the place where the methamphetamine was found was his home. Thus, the record clearly supports a finding that Osborn had the right to possess the place where the drugs were found.

In addition, Osborn engaged in a standoff with police, and he prevented them from entering his home by using a gun to threaten police officers even though he claimed at trial that he wanted the police to come to his home due to the two male intruders. Further, Osborn admitted at trial that he burned a washcloth which had methamphetamine on it. The jury could have reasonably inferred that Osborn did not want police to enter his residence because he did not want them to discover the methamphetamine and that he burned the washcloth to hide evidence of the methamphetamine. The jury could have reasonably found these acts showed a consciousness of guilt. *See Evans*, 202 S.W.3d at 162 n.12 (listing a consciousness of guilt as a factor affirmatively linking an accused to the contraband).

13

Police found two bongs in Osborn's home, including a bong resembling a Gatorade bottle that Barraza described as similar to the bong she had witnessed Osborn previously use to smoke methamphetamine. *See id.* (setting out that factor that may show an affirmative link to contraband includes whether drug paraphernalia is present). Osborn admitted that he had in the past smoked methamphetamine in his home.

When he was arrested, although Osborn spoke to the police, he did not inform them that there had been several people in his home using methamphetamine. In addition, the police officers who were present during the stand-off with Osborn, each testified that based on their experience and training as police officers, Osborn's behavior was consistent with the behavior of a person under the influence of methamphetamine. *See id.* (including that the defendant was under the influence of drugs as a factor linking the defendant to the drugs).

We conclude that the logical force of the combined evidence is sufficient to affirmatively link Osborn to the contraband. *See Tate*, 500 S.W.3d at 414. In other words, the evidence included factors other than Osborn's mere presence that connected him to the methamphetamine. Under these circumstances, the evidence established that Osborn exercised care, control, and management over the contraband and knew that the substance was contraband. *See id.* Thus, viewing the evidence in the light most favorable to the verdict, a rational trier of fact could have found beyond a reasonable doubt that Osborn committed the offense of possession of a controlled substance. *See Brooks*, 323 S.W.3d at 899. The evidence is therefore sufficient to support the verdict. *See id.* We overrule Osborn's sole issue.

## IV. CONCLUSION

We affirm the trial court's judgment.

JAIME TIJERINA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
28th day of October, 2021.

15