

# NUMBER 13-23-00380-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**MATTHEW RAY LUCKEY,**                                                        **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                        **Appellee.**

---

## ON APPEAL FROM THE 24TH DISTRICT COURT
## OF CALHOUN COUNTY, TEXAS

---

## MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Tijerina and Peña
Memorandum Opinion by Justice Tijerina**

Appellant Matthew Ray Luckey was convicted of stalking and was sentenced to

eighteen years' confinement.[1] *See* TEX. PENAL CODE ANN. § 42.072. By one issue,

---

[1] The offense of stalking is a third-degree felony, which was enhanced in this case due to appellant's prior conviction of evading arrest or detention with a vehicle. *See* TEX. PENAL CODE ANN. §§ 12.46; 38.04.

appellant contends the evidence is insufficient to support the conviction. We affirm.

## I. STANDARD OF REVIEW AND APPLICABLE LAW

In a sufficiency review, we consider all the evidence in the light most favorable to the verdict and determine whether any rational fact finder could have found the essential elements of the crime beyond a reasonable doubt based on the evidence and reasonable inferences from that evidence. *Whatley v. State*, 445 S.W.3d 159, 166 (Tex. Crim. App. 2014); *Brooks v. State*, 323 S.W.3d 893, 898–99 (Tex. Crim. App. 2010) (plurality op.). Sufficient evidence exists if "the inferences necessary to establish guilt are reasonable based upon the cumulative force of all the evidence when considered in the light most favorable to the verdict." *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012). The fact finder is the exclusive judge of the facts, the credibility of witnesses, and the weight to be given to their testimony. *Brooks*, 323 S.W.3d at 899.

We measure the sufficiency of the evidence in reference to the elements of the offense as defined by a hypothetically correct jury charge. *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). "Such a charge [is] one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Villarreal*, 286 S.W.3d at 327 (quoting *Malik*, 953 S.W.2d at 240). The "law as authorized by the indictment" includes the statutory elements of the offense and those elements "as modified by the indictment." *Curry v. State*, 30 S.W.3d

394, 404 (Tex. Crim. App. 2000).

Here, as limited by the indictment and a hypothetically correct jury charge, the State had to prove that appellant: (1) on more than one occasion; (2) pursuant to the same scheme or course of conduct directed specifically toward A.M.; (3) knowingly engaged in conduct that constituted an offense under section 42.07 and/or conduct that appellant knew or reasonably should have known that A.M. would regard as threatening bodily injury or death for A.M.; (4) did cause A.M. to be placed in fear of bodily injury or death; and (5) would cause a reasonable person to fear bodily injury or death for herself. *See Griswold v. State*, 673 S.W.3d 423, 432 (Tex. App.—Dallas 2023, no pet.) (citing TEX. PENAL CODE ANN. § 42.072(a)).

A person commits the offense of harassment if, the person "threatens, in a manner reasonably likely to alarm the person receiving the threat, to inflict bodily injury on the person or to commit a felony against the person. . . ," and the threatening person has the "intent to harass, annoy, alarm, abuse, torment, or embarrass." TEX. PENAL CODE ANN. § 42.072(a).

## II.    THE EVIDENCE

A.M. testified in a bench trial that she had known appellant since childhood but they "went separate ways" after becoming teenagers. A.M. stated that appellant patronized her place of employment, and they would say "Hello, how are you," but "nothing really beyond that." According to A.M., in "earl[y]" 2022 at approximately 10:00 p.m., appellant "approached [her] in the parking [lot]" of her employment and spoke to her

3

in a manner that she described as "just kind of jumbled." A.M. explained that she did not recall exactly what appellant said to her, but he seemed generally agitated, she was "frightened," he "was not making a lot of sense, and [she] was just asking him to go." A.M. stated that on another night, appellant came to her place of employment "saying that . . . [she] had stolen money off of his debit card." However, A.M. "didn't speak to him directly then."

A.M. testified that shortly thereafter, starting in June 2022, appellant left messages on her cellphone that alarmed her. The State asked, "And how often was he leaving voicemails for you at first?" A.M. replied, "Not often at first. There would be one maybe every couple of weeks, and then they started more often." A.M. stated that in the "early" messages, appellant "accused [her] of dealing drugs" and of "own[ing]" and "sell[ing]" social security numbers. According to A.M., in October 2022, the messages "escalated" in frequency and the content of the messages became "more threatening." A.M. testified appellant left "graphic" messages describing "how he was going to kill" her. A.M. recalled that on "one particular weekend . . . there were several [messages] during the day, at night, some at 2:30 in the morning, 3 o'clock. This particular weekend [of October 15 and 16, 2022,] it escalated [and] there were several [messages] within a three-day time period." A.M. testified that she was "scared, fearful," and "felt targeted, terrorized." A.M. agreed with the State that appellant was harassing her and "capable of carrying through with the threats." A.M. said she recognized appellant's voice, and appellant stated his name in some of the messages. The State asked, "Was it clear to you that these

4

messages were being directed at you specifically?" A.M. replied, "Absolutely, yes."[2] A.M. testified she was afraid that appellant "was going to kill" her or cause her bodily injury.

According to A.M., on one occasion appellant left a message stating that he "would be looking through" her windows and she "found both [her] bedroom and bathroom windows unlocked." A.M. emphasized that she "always" keeps her windows locked, she does not "open them." A.M. believed that appellant had been in her house because she had just purchased a new "clawfoot bathtub," and shortly thereafter appellant "specifically [referenced] a big, new bathtub" in one of the messages. A.M. eventually reported appellant's behavior to the police.

The trial court admitted State's Exhibit No. 1, without objection, which is a flash drive containing the voicemail messages and a video that appellant sent to A.M. In the video, appellant said that he was "calling" the "FBI" to tell them that A.M. had "illegally filed charges on [him] for something [A.M. was not] involved in at all." Appellant stated, "My charges have been dismissed and thrown away. You refiled them, caused me a lot of trouble, and you were involved in something that was in Victoria County because [someone told me] about [it]. So, you need to know that I am pursuing charges against you."

Then in a subsequent voicemail message, appellant stated he knew that A.M. "filed charges" against him. Appellant said that he "[saw] something" at A.M.'s house, and "it

---

[2] On redirect examination, A.M. emphasized that she "instantly" recognized appellant's voice and that appellant "mentioned" her name several times in the messages. The State asked, "Did you have any doubts who left those voicemail messages on your phone?" A.M. said, "No."

looks like" A.M. "is trying to become part of that house, like a monster house." Appellant stated that he was accused of murder "because of" A.M. In another message, appellant (1) wanted to know "if there [was] a reason" that A.M. was trying to speak to him, (2) accused her of contacting his work, (3) claimed she had him arrested, (4) told A.M. to never call him or his wife again, and (5) advised A.M. to stop pretending to be his wife.[3] In another message, appellant stated that A.M. "will not be okay when [she] gets scalped," that she "won't like it when they kill [her]," and "when they peel . . . [her] skin." Appellant stated: (1) "You won't like it when you're covered in iodine"; (2) "I'm coming for your life, I'm coming for your die [sic]"; (3) "I'm gonna put a laceration in your eye. I'm gonna make you die. I'm gonna make you cry"; (4) "I'm gonna make you bleed"; (5) "I'm gonna come in"; (6) "I'm gonna cut your tongue out through your throat"; and (7) "It might be in the day." Appellant called A.M. "a whore" and "a slut" and said, "I'm an angel, and I'm going to tear you down. . . . I'm an animal . . . my blood will give you AIDS, it will make you die."

Next, appellant left a message stating that he was worried that A.M. was "still thinking" of killing herself and said that he walked into her house, he saw her "dirty panties," he looked in her refrigerator, and he drew things on her wall. Appellant asked, "Have you ever seen what oil does when it reaches its boiling point, what it does to the skin," and said, "One of these days, you are going to wake up with tomahawks sticking out the back of your head [indecipherable]. You're easy to get to." In another message, appellant repeated, "Geneva Convention, Geneva Convention, war is game, game is

_____

[3] A.M. denied appellant's claims that he made about her in the messages.

war." Appellant then said: "I know where you live. I know where your home is. I know how to get in your house," and "I'm not scared of anything. . . . Am I in your window? Am I in your house? Am I looking in your door? . . . Do you know that I will scalp you[, and] I will boil you in glue? Do you know what I will do to you?"

Appellant testified that A.M. had him arrested for burglary of a habitation and unauthorized use of a motor vehicle, although she was not the victim of these crimes. Appellant said he sent the video to "protect" himself because he was "concerned that [A.M.] was going to contact whatever cop that she had [him] arrested for the first time." Appellant stated, "I wasn't intending on going back to prison" as he had just been released from a four-year prison term. Appellant "felt like [A.M. intended] to [send him] back to prison." Appellant denied leaving the other messages on A.M.'s phone. When defense counsel asked him if he had "any idea how those voicemails would have ended up in her cellphone," appellant claimed that someone could have made the calls using a special "app." According to appellant he reported the "prank texts" to someone at "ATT" who said, "[T]his was an ongoing thing with several people." Appellant testified that when he approached A.M. in the parking lot of her employment, he did not "talk jumbled"; he asked A.M. for her father's phone number, which she refused to give him.

### III.    DISCUSSION

By his sole issue, appellant contends that the evidence is insufficient to support his conviction for stalking. Specifically, appellant argues that there is no evidence that he "had the requisite intent to commit the predicate offense of harassment to legally support

7

the judgment of conviction for the offense of stalking."

The evidence showed that appellant left messages on A.M.'s phone in the early morning hours threatening to cause her harm and to kill her. Appellant sent A.M. a video accusing her of "illegally filing charges" against him and stating that he would be contacting the FBI and filing charges against her. Appellant testified that he sent the video to A.M. to "protect" himself, he was "not intending on going back to prison," and he was willing to do "whatever" he had to do "to protect" himself. He told her that she would not "like it when they kill you . . . when they peel . . . your skin," he is an "animal," and his blood would give her "AIDS, it [would] make [her] die." Appellant stated that A.M. would wake up with a tomahawk sticking out of her head and that A.M. "would not be okay when [she got] scalped." Finally, appellant told A.M. he had been looking into her windows and claimed that he had broken into her home. A.M. testified that she felt terrorized and feared that appellant would either kill her or cause her bodily injury.

Viewing the evidence in the light most favorable to the verdict, the trial court could have rationally concluded that appellant, on more than one occasion and pursuant to the same scheme or course of conduct directed at A.M. knowingly engaged in conduct that appellant knew or reasonably should have known that A.M. would regard as threatening bodily injury or death for A.M. by leaving alarming and threatening messages on her phone and that A.M. regarded appellant's messages as threatening bodily injury and caused A.M. to feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended. *See Whatley*, 445 S.W.3d at 166; *Brooks*, 323 S.W.3d at 898–99; *see also* TEX.

8

PENAL CODE ANN. §§ 42.07, 42.072. On the record before us, we determine that a rational trier of fact could have found the essential elements of the offense as set out in the hypothetically correct charge for stalking beyond a reasonable doubt. *See Whatley*, 445 S.W.3d at 166; *Brooks*, 323 S.W.3d at 898–99; *see also* TEX. PENAL CODE ANN. §§ 42.07, 42.072. We overrule appellant's sole issue.

### IV. CONCLUSION

We affirm the trial court's judgment.

JAIME TIJERINA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
1st day of August, 2024.