

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-21-00094-CR
_____


DONTAVIOUS DISHAWN HANEY, Appellant

V.

THE STATE OF TEXAS, Appellee



On Appeal from the 202nd District Court
Bowie County, Texas
Trial Court No. 20F0133-202



Before Morriss, C.J., Stevens and van Cleef, JJ.
Memorandum Opinion by Chief Justice Morriss

MEMORANDUM OPINION

Denise Watson died from injuries suffered after her boyfriend, Dontavious Dishawn Haney, hit her, causing her facial fractures, a badly injured eye, a broken nose, facial and intracranial bleeding, and difficulty breathing. As a result, a Bowie County jury convicted Haney of aggravated assault with a deadly weapon causing serious bodily injury to a family member, a first-degree felony. *See* TEX. PENAL CODE ANN. § 22.02(b)(1) (Supp.). Haney was sentenced to thirty-eight years' imprisonment and was ordered to pay a $10,000.00 fine. On appeal, Haney argues that the evidence was legally insufficient to show (a) that his actions were voluntary, (b) that he acted with the required intent, or (c) that his hands were deadly weapons.

We find that (1) legally sufficient evidence supported the jury's verdict of guilt but that (2) the judgment should reflect the jury's affirmative deadly-weapon finding. Therefore, we modify the judgment and affirm it, as modified.

*(1)     Legally Sufficient Evidence Supported the Jury's Verdict of Guilt*

Haney admits that he struck Watson with his hand or fist. Yet, claiming that the strike was the result of a "reflex reaction" after Watson knocked Haney's phone from his hand, Haney argues that the evidence was legally insufficient to support the jury's findings that (a) his actions were voluntary, (b) he had the required mens rea at the time of the offense, and (c) his hands or fists were deadly weapons.

"In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt." *Williamson v. State*, 589 S.W.3d 292, 297

2

(Tex. App.—Texarkana 2019, pet. ref'd) (citing *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd)). "We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury 'to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Id.* (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007))).

"Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge." *Id.* (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "The 'hypothetically correct' jury charge is 'one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Id*. (quoting *Malik*, 953 S.W.2d at 240).

> Here, the State alleged that Haney
>
> intentionally, knowingly, or recklessly cause[d] serious bodily injury to <u>Denise Watson</u>, by <u>hitting Denise Watson with his hand and/or fist and/or hitting Denise Watson with his hand and/or fist and causing her to strike the wall</u>, and the defendant did then and there use or exhibit a deadly weapon, to-wit: <u>his hand and/or fist</u>, during the commission of said assault, and the said <u>Denise Watson</u>, was then and there <u>a member of the defendant's family or household or a person with whom the defendant has or has had a dating relationship</u>, as described by <u>Section 71.005, Section 71.0021 & Section 71.003</u> of the Texas Family Code.

At trial, it was undisputed that nineteen-year-old Haney and twenty-one-year-old Watson were in a dating relationship and were cohabitating in Watson's mother's home with Jacquanise

3

Johnson.[1]  Those who knew Haney and Watson described their relationship as abusive.  Chynna Ware, Watson's friend and co-worker, testified that Haney and Watson argued often, that their relationship had turned violent, and that she saw Haney push Watson.  Shenika Shavers, Watson's neighbor, also characterized Haney and Watson's relationship as abusive and testified that she witnessed Haney strike Watson on a "couple of" occasions.  Ware and Shavers both testified that they saw bruises on Watson.  Even Haney, who testified in his defense, admitted that his relationship with Watson was "toxic."

On the night before the offense, Ware testified that Watson video chatted with her from her car.  According to Ware, Watson's "face was real puffy and swollen, like she had been crying, you know, like something hysterical, like something was wrong."  When Watson told Ware that she was scared, Ware "told her to call the police, put [Haney] out."  Watson walked back into her house while she was still on video with Ware, but Ware testified that the "phone went dead" suddenly.

On the day of the incident, Shavers said that she heard Watson crying and telling Johnson that she was hurt.  Shavers went to investigate, but Haney would not open the door.[2]  Shavers testified that she returned to her house, later "heard a bunch of commotion" and Haney's "fussing" coming from Watson's home, and returned to Watson's house to break up the fight.  Again, no one answered the door.

---

[1]Johnson was the mother of Watson's deceased brother's son.

[2]Watson's mother was not home.

Johnson testified that she woke up to Haney and Watson arguing. Johnson went to the living room and saw the right side of Watson's head hit a wall after Haney threw her against it. Johnson retrieved her phone from her room and was unable to witness any further altercation but noticed on returning to the living room that Watson's nose was broken, and her nose and eyes were bleeding. Johnson became extremely upset and questioned Haney, who responded only by saying that Watson had smacked his phone out of his hand. Johnson testified that she helped Watson to the couch because it looked as if she wanted to rest, eventually noticed that Watson had stopped breathing, and told Haney to call the police, which he did.

Benjamin Thomes, a patrol officer with the Texarkana, Texas, Police Department (TTPD), testified that he responded to the call and arrived at Watson's home to find her lying on her back, unresponsive and nude, with only Haney and Johnson there. Thomes said that Haney was on the phone with dispatchers, who were coaching him to perform CPR, and that Haney was "somewhat" trying to perform CPR on Watson. Thomes took over the task of attempting to revive Watson and saw evidence of injuries on her body.

Thomes's body-camera footage, which was played for the jury, showed that Haney, while making a closed fist, admitted to Thomes that he had hit Watson in the face with his left hand, causing her to bleed from her nose. He then told Thomes that it was a "reflex" because Watson had "slapped [his] phone out of [his] hand." Lauren Lynch, another TTPD officer, testified that Haney, who told Lynch he had "jabbed" Watson with his left hand, had an injury to his right hand. When Lynch questioned him about this injury, Haney said he had punched a hole in a

bedroom wall.[3]  Spencer Price, a crime-scene analyst with TTPD, testified that the hole in the bedroom wall was "near [his] knees."  Cody Harris, a detective with TTPD, opined that, since the hole in the wall was low, Haney had not caused that hole by punching the wall.

Harris testified that Haney admitted, during an interview, that he had argued with Watson the night before the incident.  According to Harris, Haney said he continued the fight with Watson while she was in the shower the following morning and broke her phone out of anger. Haney told Harris that Watson said she no longer wanted to be with him because he beat her. Harris testified that Haney admitted that, after Watson slapped Haney's phone from his left hand, he "jabbed [Watson] with his left hand," did not realize he was going to hit her hard, but soon found that Watson was "down" and could not breathe.

Shatelia Walker-Scott, a TTPD officer, testified that paramedics on the scene reported that Watson had sustained blunt-force trauma to her head and believed "there was some suspicious activity going on" because Watson's injuries did not match Haney's account.  Watson was rushed to the emergency room.  Price testified that Watson suffered numerous facial fractures and "developed a major brain bleed from inside of her head to the point they actually had to remove part of her skull to relieve some of the pressure."

Dr. Marcus Andrew Smith, a neurosurgeon at Christus St. Michael Hospital, testified that Watson underwent emergency surgery, which revealed "a significant amount of cerebral edema, or brain swelling, really [not] what you would expect to see with just swelling from a bleed or from just a trauma that fast."  Smith testified about Waston's multiple facial fractures, including

---

[3]Lynch also observed a bloody towel near the front door and blood on the living room couch.

6

an orbital blowout fracture, which was not a "terribly uncommon" injury resulting from a punch to the face. Of greater importance was Watson's maxillary fracture, which "indicate[d] . . . more force than the orbital fracture" because it was a "thicker bone." As a result, Smith believed Watson had suffered "a pretty significant trauma" that required "a significant blow[,] . . . typically a closed-fisted strike." Watson did not survive her injuries.

Dr. Grant Herndon, a medical examiner at the Dallas County Medical Examiner's Office, testified that Watson, who presented with two black eyes, weighed two hundred and fifty pounds. While Watson had no skull fracture, Herndon said she had a "shearing injury" that was consistent with a strike against a wall. Herndon testified that Watson's facial injuries were also consistent with being struck by significant force in the face with a "balled up fist," and he concluded that she had died because of blunt-force head injury.

Harris testified that fists could be deadly weapons, and Price opined that Haney's use of his hands and fists caused Watson's serious bodily injury and that they constituted deadly weapons. In rebutting Haney's claim that he acted out of reflex, Harris testified that Haney said he was holding his phone in his left hand, which made it "very hard [for Harris] to believe that he could have a reflexive action out of his left hand that's being actively swatted away by the victim." Harris also said that Haney claimed Watson "stumbled into the wall and then slid down it," which raised Harris's suspicions since there was a couch where Haney said Watson hit the wall. Harris testified that he believed Haney's actions were voluntary.

Testifying in his defense, Haney gave his own version of the events causing Watson's death. Haney said that Watson became upset on the day before the incident when she saw that

7

another woman had called Haney's phone and concluded that he was cheating on her. The next morning, Haney tried to plead with Watson to speak with him, but she refused. Instead, she started watching Facebook videos on her phone and kept ignoring Haney. Haney testified that he became upset over Watson's lack of attention and grabbed her phone, causing Watson to scream and yell, "[S]ee, this why I don't want to be with you; you want to beat on me." Haney said that he threw her phone, breaking it because she had "triggered" him, and he "just kind of lost it." According to Haney, Watson "start[ed] hitting on the wall and then yelling and stuff," locked herself in the bathroom, and took a shower.

Haney testified that he unlocked the bathroom door with a screwdriver and that Watson came out into the living room and insisted that Haney leave the house. Haney began texting his cousin to inform him that he was going to his house and said Watson "got in [his] face" and tried to look at his phone because she believed he was texting another woman. According to Haney, Watson "pushed up against [him]" and "smacked" his phone from his hand. Haney testified that he "had a quick reflex" and hit Watson with a "quick jab" while she was by the wall. Haney admitted that his fist contacted Watson's face, and he said she "pick[ed] her face up," turned to the wall, hit the wall, and dropped to the ground. Haney said he apologized and told Watson he "didn't mean to touch [her]" when "a lot of blood started" streaming from her nose. Johnson came into the room, and she and Haney placed Watson, who did not want to call an ambulance, on the couch. Johnson and Haney brought Watson ice and attended to her. Haney said he called for an ambulance when Watson stopped breathing and began turning pale.

During cross-examination, Haney admitted that he had hit Watson so hard that her eye could not be opened because of his direct impact but claimed he "didn't mean to hit her." Haney also claimed that he had never hit Watson before.

### (a)     Sufficient Evidence Proved Haney's Actions Were Voluntary

Haney argues that, because his action was an involuntary reflex, the evidence was insufficient to establish the required mens rea. Yet, "the issue of the voluntariness of one's conduct, or bodily movements, is separate from the issue of one's mental state." *Whatley v. State*, 445 S.W.3d 159, 166 (Tex. Crim. App. 2014) (citing *Adanandus v. State*, 866 S.W.2d 210, 230 (Tex. Crim. App. 1993)). "Section 6.01(a) of the Texas Penal Code requires a voluntary—i.e., volitional—act as an element of guilt." *Id.* (citing TEX. PENAL CODE ANN. § 6.01(a) ("A person commits an offense only if he voluntarily engages in conduct, including an act, an omission, or possession.")). "This is a distinct inquiry from the . . . *mens rea* requirement." *Id.*

"'Voluntariness,' within the meaning of Section 6.01(a), refers only to one's own physical body movements." *Id.* (quoting *Rogers v. State*, 105 S.W.3d 630, 638 (Tex. Crim. App. 2003)). "If those physical movements are the nonvolitional result of someone else's act, are set in motion by some independent non-human force, are caused by a physical reflex or convulsion, or are the product of unconsciousness, hypnosis, or other nonvolitional impetus, that movement is not voluntary." *Id.* (quoting *Rogers*, 105 S.W.3d at 638).

Although Haney argues that he "jabbed" Watson once out of reflex, ample evidence supported a finding to the contrary. Testimony from Ware and Shavers established that Watson and Haney had an abusive relationship, which even Haney characterized as "toxic." Shavers said

9

that she witnessed Haney strike Watson before, and both Shavers and Ware saw bruises on Watson. On the night before her death, Watson told Ware that she and Haney had argued and that she was scared.

On the day of Watson's death, Johnson testified that she woke up to Haney and Watson arguing. She testified that Haney threw Watson against a wall, causing her to hit her head. On returning to the living room, Johnson saw that Watson's nose was broken and her nose and eyes were bleeding. It is undisputed that Haney caused the severe damage suffered by Watson. Even though Watson was a large woman, Haney caused multiple facial fractures, including a maxillary fracture that Smith and Herndon testified would have required a significant blow. Although Haney claimed to have inflicted the injuries with his non-dominant left hand, Harris testified that it was not likely that Haney would have been able to engage in a reflexive action with the same hand that held the phone Watson had just swatted away. Moreover, Lynch testified that Haney had an injury to his right hand and, although he claimed to have injured it by punching a wall, the jury could have disbelieved that statement since the hole in the wall was located near Price's knees and not at torso level. Instead, the jury was free to believe that Haney had injured his right hand after inflicting blunt force trauma on Watson through a significant blow or blows to the face. According to Walker-Scott, paramedics did not believe Haney's account due to the extent of Watson's injuries, and the jury was not required to believe it either. In other words, given the history of the relationship between Haney and Watson, Watson's weight, the amount of force that was required to inflict Watson's serious injuries, and Johnson's testimony, the jury was free to reject Haney's claim that he only "jabbed" Watson once as an involuntary reflex.

10

"[A]n inference is a conclusion reached by considering other facts and deducing a logical consequence from them." *Whatley*, 445 S.W.3d at 166 (quoting *Hooper*, 214 S.W.3d at 16). "Faced with a record of historical facts that support conflicting inferences, the reviewing court must presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* (quoting *Padilla v. State*, 326 S.W.3d 195, 200 (Tex. Crim. App. 2010) (quoting *Jackson*, 443 U.S. at 326). Viewing the evidence in the light most favorable to the jury's verdict of guilt, we conclude that the evidence presented to the jury, along with reasonable inferences therefrom, was sufficient to support a finding beyond a reasonable doubt that Haney's actions were voluntary.

*(b)    Sufficient Evidence Proved Haney Had the Required Mens Rea*

Next, we address Haney's complaint that he did not possess the required mens rea for the offense. Under the hypothetically correct jury charge, the State could carry its burden by showing either intentional, knowing, or reckless conduct. *See* TEX. PENAL CODE ANN. § 22.02; *Landrian v. State*, 268 S.W.3d 532, 537 (Tex. Crim. App. 2008).[4] Haney argues that no rational jury could have concluded that it was his conscious objective or desire to cause serious bodily injury to Watson. This argument—that the State was required to prove that he intentionally, knowingly, or recklessly caused *serious* bodily injury—is mistaken.

---

[4]Aggravated assault is a result-of-conduct offense. *Landrian*, 268 S.W.3d at 543. "A person acts intentionally, or with intent, with respect . . . to a result of his conduct when it is his conscious objective or desire to . . . cause the result." TEX. PENAL CODE ANN. § 6.03(a). "A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." TEX. PENAL CODE ANN. § 6.03(b). "A person acts recklessly, or is reckless, with respect to . . . the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." TEX. PENAL CODE ANN. § 6.03(c). Further, "[t]he risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint." *Id.*

11

In a unanimous opinion, the Texas Court of Criminal Appeals decided that "[a]ggravated assault does not require a culpable mental state with respect to the element of 'serious bodily injury.'" *Rodriguez v. State*, 538 S.W.3d 623, 627 (Tex. Crim. App. 2018). The court explained that "the inclusion of a serious-bodily-injury element to the offense of aggravated assault 'separates already-unlawful conduct from even more egregiously unlawful conduct.'" *Id.* at 629 (quoting *White v. State*, 509 S.W.3d 307, 313 (Tex. Crim. App. 2017)). Consequently, "[t]he line between lawful and unlawful conduct is crossed when one goes from accidentally causing bodily injury to culpably causing bodily injury—not when one goes from culpably causing bodily injury to culpably causing serious bodily injury." *Id.* "It is therefore quite appropriate that, under Section 22.02, the offender must bear some culpability with respect to causing bodily injury, else he will not be guilty even of simple assault." *Id.* "But once he, with a guilty mind, succeeds in injuring another, it is not unreasonable that he should be criminally responsible for any serious bodily injury that may occur." *Id.*

"An actor's culpable mental state is generally shown by circumstantial evidence." *Moya v. State*, 426 S.W.3d 259, 266 (Tex. App.—Texarkana 2013, no pet.) (citing *Moore v. State*, 969 S.W.2d 4, 10 (Tex. Crim. App. 1998) (en banc)). "Culpability may be inferred from the acts, words, and conduct of the accused." *Id.* (citing *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995)). In determining intent, "we should look at 'events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act.'" *Wirth v. State*, 361 S.W.3d 694,

697 (Tex. Crim. App. 2012) (quoting *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004)).

Haney and Watson had an abusive relationship and were arguing on the morning of the offense. In Haney's own words, Watson had "triggered" him, and he "just kind of lost it." Johnson testified that Haney had pushed Watson into the wall, and Haney admitted that he had hit Watson in the face. The commotion was loud enough for Shavers to hear that Watson was crying and telling Johnson that she was hurt. It was undisputed that Haney caused Watson's severe injuries by actions that we have already determined were voluntary based on sufficient evidence discussed above. After the incident, Haney "balled up" his fist when describing to Thomes how he had hit Watson, causing her severe eye injury from direct impact. According to officers and paramedics on the scene, Haney's story about how the incident occurred and how Watson had hit the wall did not match up with the physical evidence at the scene or with Watson's injuries, which were severe.

Viewing the evidence in the light most favorable to the jury's verdict, which included Haney's admissions and the severity of Watson's injuries, we conclude that a rational jury could find, beyond a reasonable doubt, that Haney intentionally, knowingly, or recklessly caused bodily injury to Watson when he pushed her into the wall and struck her in the face with force strong enough to cause severe injury and ultimately death. Because the line between lawful and unlawful conduct was crossed when Haney culpably caused bodily injury, he was criminally responsible for any serious bodily injury without any separate finding that he had the mens rea to commit serious bodily injury. *Rodriguez*, 538 S.W.3d at 629; *see Martinez v. State*, 633 S.W.3d

13

698, 705 (Tex. App.—Houston [14th Dist.] 2021, pet. ref'd).  In conclusion, we find that legally sufficient evidence supported the jury's mens rea finding.

*(c)        Sufficient Evidence Proved that Haney's Hands and Fists Were Deadly Weapons*

Next, Haney argues that the evidence was legally insufficient to support the jury's deadly-weapon finding because he struck Haney only once and because the State did not dispute that Watson struck the wall.  While the arguments here may not be crystal clear, Haney seems to suggest that the serious bodily injury to Watson was caused by the wall, not his fist.  We disagree.

The Texas Penal Code defines a "[d]eadly weapon" to include "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury."  TEX. PENAL CODE ANN. § 1.07(a)(17)(B); *see Tucker v. State*, 274 S.W.3d 688, 691 (Tex. Crim. App. 2008). "'Bodily injury' means physical pain, illness or any impairment of physical condition." TEX. PENAL CODE ANN. § 1.07(a)(8).  "'Serious bodily injury' means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ."  TEX. PENAL CODE ANN. § 1.07(a)(46)).

"Although a fist or hand is not a deadly weapon per se, it can become a deadly weapon if in the manner of use it is capable of causing death or serious bodily injury." *Brooks v. State*, 900 S.W.2d 468, 472 (Tex. App.—Texarkana 1995, no pet.) (citing *Turner v. State*, 664 S.W.2d 86, 90 (Tex. Crim. App. [Panel Op.] 1983)); *see Davis v. State*, 533 S.W.3d 498, 508 (Tex. App.—Corpus Christi 2017, pet. ref'd) (citing *Lane v. State*, 151 S.W.3d 188, 191 (Tex. Crim. App.

14

2004)). "Intent to use the hands as deadly weapons is not required." *Id.* at 473 (citing *Clark v. State*, 886 S.W.2d 844, 845 (Tex. App.—Eastland 1994, no pet.)). "[T]he injuries, if any, inflicted on a complainant are factors to be considered in determining whether a hand was used as a deadly weapon." *Davis*, 533 S.W.3d at 508 (citing *Lane*, 151 S.W.3d at 191). "In concluding that hands were used as a deadly weapon, Texas courts have cited injuries such as unconsciousness, vision impairment, brain injury, internal injury, and those suffered from strangulation." *Id.*

The fact that Watson suffered serious bodily injury and died as a result is uncontested in this case. The evidence showed that Watson sustained serious facial injuries because of a direct blow, and TTPD officers testified that Haney used his hands and fists as a deadly weapon. By Haney's own account, Watson held her face from pain after the punch before colliding with the wall, and she profusely bled from her face. The following cross-examination of Haney established that he admitted those injuries were caused by his hands:

> Q. Okay. Did you hear the evidence of the surgeon come in here and say he couldn't pry her eye open because it was blown out by a direct impact? Did you hear that?
>
> A. Yeah, I heard that.
>
> Q. Okay. Was that you that did that?
>
> A. That was me.
>
> . . . .
>
> Q. . . . . How did [Watson] die . . . ?
>
> A. From her suffocating on blood, brain injury.

15

Q.      Did you cause that injury?

A.      Yes.

Q.      So you killed her?  Yes or no?

A.      Yes.

Also, the jury was free to disbelieve Haney's claim that Watson stumbled into the wall and to instead believe Johnson's testimony that she witnessed Haney throwing Watson against the wall with his hands.  After reviewing all the evidence, we conclude that legally sufficient evidence supported the finding that Haney used his hands or fists in a manner capable of causing death or serious bodily injury.

We find that legally sufficient evidence supported the jury's finding of guilt. Consequently, we overrule Haney's points of error.

*(2)      The Judgment Should Reflect the Jury's Affirmative Deadly-Weapon Finding*

Though we have overruled Haney's point of error, we must modify the trial court's judgment to correct a clerical error.  "We have the authority to modify the judgment to make the record speak the truth."  *Minter v. State*, 570 S.W.3d 941, 944 (Tex. App.—Texarkana 2019, no pet.) (citing TEX. R. APP. P. 43.2(b); *French v. State*, 830 S.W.2d 607, 609 (Tex. Crim. App. 1992); *Rhoten v. State*, 299 S.W.3d 349, 356 (Tex. App.—Texarkana 2009, no pet.)).  "Our authority to reform incorrect judgments is not dependent on the request of any party, nor does it turn on a question of whether a party has or has not objected in trial court; we may act sua sponte and may have a duty to do so."  *Rhoten v. State*, 299 S.W.3d 349, 356 (Tex. App.—Texarkana 2009, no pet.).

16

The record shows that the trial court submitted to the jury a special issue asking whether Haney's "hands and/or fists" were deadly weapons. The jury specifically found that Haney had used a deadly weapon during the commission of the offense. Even so, the trial court's judgment contains the notation "N/A" under the heading "Findings on Deadly Weapon." To make the record speak the truth, we modify the trial court's judgment to reflect the jury's affirmative deadly-weapon finding.

We modify the deadly-weapon finding in the judgment to merely state "YES" and affirm the judgment, as modified.

Josh R. Morriss, III
Chief Justice

Date Submitted:     April 25, 2022
Date Decided:       May 17, 2022

Do Not Publish

17